CALVIN E. DAVIS (SBN: 101640)
cdavis@gordonrees.com
GORDON & REES LLP
633 West Fifth Street, Suite 4900
Los Angeles, CA 90071
Telephone: (213) 576-5000
Facsimile: (213) 680-4470

PHILLIP K. WANG (SBN: 186712)
pwang@gordonrees.com
MORGAN V. ANDREWS (SBN: 237680)
mandrews@gordonrees.com
GORDON & REES LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 986-5900
Facsimile: (415) 986-8054

Attorneys for Plaintiffs
CENTURY 21 REAL ESTATE LLC

**FILED**

 1 : 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

BY FAX

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

CENTURY 21 REAL ESTATE LLC, a
Delaware limited liability company,

Plaintiff,

vs.

SAKHAWAT JAFFERY, aka JEFF SAKS,
individually and doing business as CENTURY
21 SAKS TEAM and/or CENTURY 21 TODAY
REALTY,

Defendant.

CASE NO. **C 07 3154 EMC**

**COMPLAINT FOR**
**(1) Federal Trademark Infringement**
**(15 U.S.C. § 1114);**
**(2) False Designation of Origin and**
**False Advertising (15 U.S.C.**
**§1125(a);**
**(3) Trademark Dilution (15 U.S.C.**
**§ 1125(c);**
**(4) Common Law Trademark**
**Infringement;**
**(5) Unfair Competition (Cal. Bus. &**
**Prof. § 17200 et seq.);**
**(6) Common Law Unfair Competition**
**(7) Breach Of Contract;**
**(8) Breach of Guaranty;**
**(9) Quantum Meruit; and**
**(10) Accounting;**

Plaintiffs Century 21 Real Estate LLC, for its cause of action against SAKHAWAT

JAFFERY, aka JEFF SAKS, an individual and citizen of the State of California, doing business

as CENTURY 21 SAKS TEAM and/or CENTURY 21 TODAY REALTY, alleges as follows:

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

KLGY 1944640/1229329v.1

- 1 -

1

**PARTIES**

2    1.    Plaintiff Century 21 Real Estate LLC is a Delaware limited liability company.

3    2.    Defendant SAKHAWAT JAFFERY, aka JEFF SAKS (hereinafter referred to as

4    "Defendant" or "Saks") is an individual who is a citizen of the State of California and is doing

5    business as CENTURY 21 SAKS TEAM and/or CENTURY 21 TODAY REALTY.

6

**NATURE OF ACTION**

7    3.    This is an action for willful violations by Defendant of Plaintiff's intellectual

8    property rights, including trademark infringement, arising out of Defendant's unauthorized use

9    and/or infringement of Plaintiff's Century 21 trademarks. This action also includes claims for

10    common law and state trademark infringement, federal and state claims for unfair competition,

11    and breach of franchise agreement and guaranty, among others.

12

**JURISDICTION**

13    4.    This action arises under the trademark laws of the United States, specifically the

14    Lanham Act, 15 U.S.C. § 1051 et seq. and under California state law, specifically under

15    Business and Professions Code § 14340. This Court has subject matter jurisdiction over these

16    claims as federal questions pursuant to 28 U.S.C. § 1331 and 1338(a)(b) and supplemental

17    jurisdiction pursuant to 28 U.S.C. § 1367. The Court further has pendent jurisdiction of the

18    California state law claims under 28 U.S.C. § 1338(b).

19

**VENUE**

20    5.    Venue is proper in this district in that all Defendant are subject to personal

21    jurisdiction in this district at the time the action is commenced, and there is no other district in

22    which the action may be brought.

23

**INTRADISTRICT ASSIGNMENT**

24    6.    The San Jose Division of the Northern District of California is proper as all of the

25    acts, events and contracts in question arose in Santa Clara, California, and the Defendant's

26    business is and was situated at 2075 De La Cruz Boulevard, Santa Clara, California, which is

27    within the jurisdiction of the San Jose Division.

28

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

- 2 -

COMPLAINT FOR DAMAGES                                    CASE NO.

## TRADEMARK ALLEGATIONS

7.    Century 21 is one of the world's leading real estate brokerage franchisors.

8.    To promote brand awareness and to ensure consistency among its member offices, Century 21 has developed an expansive franchise system that provides its member offices with the marketing tools, resources, and know-how to run an effective full service real estate office ("Century 21 Franchise System"). In addition, Century 21 utilizes and relies on a family of trade and service marks that provide unmatched brand identity for the Century 21 Franchise System ("CENTURY 21 Marks")

9.    Plaintiff owns the federally registered trademark "CENTURY 21." "CENTURY 21" was first registered in 1977 and has been in continual use nationally and in interstate commerce for use for real estate brokerage services since that time.

10.    Plaintiff owns the California registered trademark Century 21.

11.    Plaintiff has used the CENTURY 21 Marks to identify its goods, services, and brand. In this connection, Plaintiff uses the CENTURY 21 Marks on goods, and in advertisements, education, training manuals, newsletters, global computer networks, radio programs, training services, awards, residential, commercial and mortgage brokerage services, mortgage banking services, residential and commercial construction and renovation services, computer software, management and leasing services, real estate consulting services, coupons, referral services, lending institutions, relocations services, and the like. Century 21 has invested much time, effort and millions of dollars in advertising and promoting the goods and services offered under the CENTURY 21 Marks and Century 21 brand such that the CENTURY 21 Marks have become famous.

12.    Century 21's goods and services have been, and continue to be, extensively advertised and used throughout the United States and worldwide. By virtue of advertising and sales, together with consumer acceptance and recognition, the CENTURY 21 Marks identify the goods and services of Century 21 and its authorized licensees only and distinguishes them from goods and services offered by others. The CENTURY 21 Marks have thus become, and

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

- 3 -

1    continue to be, a valuable asset symbolizing CENTURY 21, its quality and superior services, and
2    its goodwill.

3    ## FRANCHISE AGREEMENT AND PERSONAL GUARANTY

4    13.    Defendant entered into a Century 21 Real Estate Franchise Agreement

5    ("Agreement") with Plaintiff effective September 19, 2005. That Agreement is attached hereto

6    as Exhibit A and incorporated by reference as though fully set forth herein.

7    14.    Under the Agreement, Defendant became franchisee of Plaintiff Century 21 as a

8    real estate brokerage business. Pursuant to the terms of the Agreement, Plaintiff agreed, among

9    other things, to grant a non-exclusive license to Defendant to utilize Plaintiff's trademarks and

10    marketing system. In return, Defendant agreed, among other things, to (1) continuously operate

11    the business; (2) to pay to Plaintiff Century 21 six percent (6%) of all of Defendant' gross

12    revenues under paragraph 8 of the Agreement ("royalty fees"); (3) to pay two percent (2%) of

13    their Gross Revenues for a National Advertising Fund ("NAF") for advertising expenses, with a

14    minimum monthly fee of $562.00.

15    15.    Further, Saks signed a personal guaranty for all the obligations under the

16    Agreement ("Guaranty"). The Guaranty is attached hereto as Exhibit B and is incorporated by

17    reference as though fully set forth herein.

18    16.    After entering into the Agreement, and operating as a franchisee of Plaintiff,

19    Defendant failed to pay amounts owing under the Agreement, including, but not limited to,

20    royalty fees and NAF fees, constituting a material breach of the Agreement. Plaintiff properly

21    notified Defendant of these defaults in writing of the material breaches and provided the

22    appropriate opportunity to cure required under the Agreement. Defendant failed and refused,

23    and continues to fail and refuse, to cure these defects.

24    17.    Pursuant to Section 16 of the Agreement, the Agreement with Defendant was

25    terminated for good cause on September 20, 2006.

26    18.    Plaintiff informed Defendant that as of the date of termination, they were to cease

27    use of all CENTURY 21 Marks on anything that would identify him with Century 21, which

28    include, but are not limited to, signs, advertising, letterhead, and listings. Specifically, Section

- 4 -

COMPLAINT FOR DAMAGES                                                    CASE NO.

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

16 of the Agreement specifically provides that upon termination by expiration, the franchisee shall, among other things: 1) immediately and permanently discontinue use of all CENTURY 21 Marks; 2) return to Plaintiffs all, films, cassettes, instruction manuals which are part of their program; 3) refrain from any representation whatsoever that he is a CENTURY 21 franchisee or is or has been affiliated with CENTURY 21 in any way; 4) take any affirmative action necessary to remove any use of the CENTURY 21 Marks in connection with his business; 5) advise all current listings that he is no longer associated with CENTURY 21; and 6) immediately cause the local phone company (white pages) and any business phone publisher (i.e., the Yellow Pages) to remove him from any directory or listings, including any Internet directories.

19.    In or around March, 2007, Plaintiff first learned that Defendant had continued to use the CENTURY 21 Marks after termination of the Agreement for cause, including but not limited to the continued, unauthorized use of Plaintiff's CENTURY 21 Marks in Defendant's external and internal office signage, website and other internet listings, and telephone greetings.

20.    On March 27, 2007, Plaintiff sent Defendant a letter demanding that Defendant immediately cease and desist from further unauthorized use of the CENTURY 21 Marks. Defendant ignored Plaintiff's demands and willfully continues his unauthorized use of Plaintiff's CENTURY 21 Marks.

21.    Up through the date of termination, pursuant to the Agreement, Plaintiff is entitled to six percent (6%) of monthly gross revenues for royalties defined in the Agreement and two percent (2%) of gross revenues for the NAF contribution with minimum payments of $562.00 monthly for NAF. Should any additional amounts be found to be owed to Plaintiff based on these provisions, or pursuant to any other provisions of the Agreement between the parties, Plaintiff is also entitled to recover these amounts at trial of this action, including interest thereon.

22.    Pursuant to the terms of the Agreement, in the event of early termination of the Agreements for cause, Plaintiff is entitled to recover additional liquidated damages calculated as follows based on a formula in the Agreement contained at section 16.7.2: the combined monthly average of royalty fees, NAF fees, and any other fees owed under the Agreement from the effective date through the date of early termination, multiplied by the number of months (or

- 5 -

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

1   partial months) remaining in the term of the Agreement. The present value of these amounts is

2   to be discounted at a rate of eight percent (8%).

3       23.     Pursuant to the contractual calculations, Defendant owes Plaintiff no less than

4   $109,925.00 for past due royalties, NAF fees, and additional contractual damages in the

5   Agreement.

6                          **FIRST CLAIM FOR RELIEF**

7      **(Federal Trademark Infringement Pursuant To 15 U.S.C. § 1114)**

8

9       24.     Plaintiff incorporates by reference the allegations set forth above in paragraphs 1

10   through 23, as though fully set forth herein.

11       25.     Plaintiff is the legal owner of the CENTURY 21 Marks. Plaintiff has not

abandoned any of the CENTURY 21 Marks since its first use, and all of the CENTURY 21

12 Marks have been, and continue to be, in continuous use. All of the CENTURY 21 Marks have

13 been duly registered with the USPTO and their registrations remain current.

14       26.     Under the Agreement, Defendant was granted a limited, non-exclusive license to

15 use the CENTURY 21 Marks in connection with the CENTURY 21 SAKS TEAM franchise,

16 which license expired immediately upon the termination of the Franchise on September 20,

17 2006. Even before the termination of the Agreement, however, Defendant was using the

18 CENTURY 21 Marks outside the scope of his license by doing business as CENTURY 21

19 TODAY REALTY, constituting infringement and unauthorized use of the Marks.

20       27.     Prior to September 20, 2006, Defendant was informed that as of the date of

21 termination, Defendant no longer had Plaintiff's permission to use the CENTURY 21 Marks.

22 Defendant also, pursuant to Section 16 of the Agreement, expressly agreed to discontinue further

23 use of the CENTURY 21 Marks following termination.

24       28.     On March 27, 2007, Plaintiff sent a letter to Defendant demanding that he

25 immediately cease and desist further unauthorized use of the CENTURY 21 Marks. However,

26 despite Defendant's agreement to discontinue further use of the CENTURY 21 Marks, and

27 despite Defendant's actual knowledge that his use of the CENTURY 21 Marks following the

28

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

- 6 -

1    date of termination was no longer authorized, Defendant continued, and continues, to use the

2    CENTURY 21 Marks in violation of Plaintiff's exclusive rights to those Marks.

3        29.    The unauthorized use of the CENTURY 21 Marks by Defendant as explained in

4    detail above, is likely to cause confusion, mistake, and/or deception among consumers as to the

5    source, quality, and nature of their goods and services. The unauthorized use of the CENTURY

6    21 Marks by the Defendant also likely creates the misconception among consumers that Plaintiff

7    somehow ratifies, authorizes, and/or is affiliated in some manner with the business of the

8    Defendant, when such is no longer the case.

9        30.    Because the continued use of the CENTURY 21 Marks by the Defendant is likely

10    to continue to cause confusion, mistake, and/or deception as to the source, origin, affiliation, or

11    sponsorship of the goods and services promoted under the CENTURY 21 Marks, Plaintiff lacks

12    an adequate remedy at law. Unless an injunction is issued enjoining the Defendant from any

13    continuing or future infringing use of the CENTURY 21 Marks, Plaintiff will continue to sustain

14    irreparable damages. Pursuant to 15 U.S.C. § 1116(a), Plaintiff is entitled to an order enjoining

15    the Defendant from using the CENTURY 21 Marks in connection with their real estate business.

16        31.    As a direct and proximate cause of the infringing conduct by the Defendant,

17    Plaintiff has been damaged and will continue to be damaged. Pursuant to 15 U.S.C. § 1117(a),

18    Plaintiff is entitled to an order requiring the Defendant to account to Plaintiff for any and all

19    profits derived by the Defendant from the unauthorized use of the CENTURY 21 Marks, as

20    detailed herein, and to an order awarding all damage sustained by Plaintiff by reason of the

21    infringement caused by the Defendant.

22        32.    As evidenced by the refusal to cease further use of the CENTURY 21 Marks after

23    notice to cease and desist further use of the CENTURY 21 Marks following the date of

24    termination, the Defendant's continued use of the CENTURY 21 Marks following the date of

25    termination was intentional, in conscious disregard of Plaintiff's rights, and constituted willful

26    and knowing trademark infringement. Plaintiff is, therefore, entitled to an award of treble

27    damages and/or enhanced profits from the Defendant, and each of them.

28

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

- 7 -

33.     Defendant's use of the CENTURY 21 Marks following the date of termination constitutes trafficking of counterfeit marks. Pursuant to 15 U.S.C. § 1117(b), Plaintiff is, therefore, entitled to a nondiscretionary award of trebled damages or trebled profits, as well as attorneys' fees and prejudgment interest.

34.     Defendant's acts make this an exceptional case under 15 U.S.C. § 1117(a), such that Plaintiff is entitled to an award of attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

### (False Designation of Origin/False Advertising Under Section 43(a) of the Lanham Act)

35.     Plaintiff incorporates by reference the allegations set forth above in paragraphs 1 through 23, as though fully set forth herein.

36.     Plaintiff is the legal owner of the CENTURY 21 Marks. Despite knowledge of Plaintiff's ownership interests in the CENTURY 21 Marks, Defendant made, and is believed to continue to make, use in interstate commerce of the CENTURY 21 Marks without Plaintiff's permission.

37.     Defendant's unauthorized use of the CENTURY 21 Marks creates a false association between the Defendant and Plaintiff. Defendant's unauthorized use of the CENTURY 21 Marks also tends to cause confusion, mistake, and/or deception among consumers as to the source, quality, and nature of their goods and services.

38.     Plaintiff is informed and believes, and thereon alleges, that the Defendant has engaged in fraudulent business practices, false advertising, and unfair competition by use the CENTURY 21 Marks, associated goodwill, and other rights without the permission of Plaintiff in an attempt to pass off their services as being affiliated with or sponsored by Plaintiff.

39.     The Defendant's use of the Century 21 Marks, goodwill, and other rights is in direct violation of 15 U.S.C. § 1125(a) et seq., constitutes false advertising and false designation of origin and/or source entitling Plaintiffs to all remedies available under the law.

40.     Pursuant to the Agreement, Plaintiff Century 21 is also entitled to an order requiring the Defendant to pay a royalty fee of six percent (6%) and a NAF fee of two percent

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

- 8 -

(2%) on all gross revenues the Defendant received during the entire period following the Date of Termination in which the Defendant used the CENTURY 21 Marks.

41.    As evidenced by Defendant's refusal to cease further use of the CENTURY 21 Marks after notice to cease and desist further use of the CENTURY 21 Marks following the date of termination, the Defendant's use of the CENTURY 21 Marks following the date of termination was intentional, in conscious disregard of Plaintiff's rights, and constituted willful and knowing trademark infringement. Plaintiff is, therefore, entitled to an award of treble damages and/or enhanced profits from the Defendant, and each of them.

42.    As a direct and proximate result of the foregoing conduct, Plaintiff is entitled to damages against the Defendant in an amount to be determined according to proof, to a preliminary and permanent injunction, and to any and all other relief the Court deems just and proper under the law.

43.    Plaintiff is also entitled by statute and pursuant to the terms of the Agreement to an award of attorneys' fees and costs incurred in having to institute this legal action.

## THIRD CLAIM FOR RELIEF

### (By All Plaintiffs For Trademark Dilution)

44.    Plaintiff incorporates by reference the allegations set forth above in paragraphs 1 through 23, as though fully set forth herein.

45.    Plaintiff is the legal owner of the CENTURY 21 Marks. The CENTURY 21 Marks are famous and distinctive. Plaintiff has invested substantial time, effort and millions of dollars in advertising and promoting the goods and services offered in interstate commerce under the CENTURY 21 Marks such that the CENTURY 21 Marks have become distinctive and famous.

46.    Despite knowledge of Plaintiff's ownership interests in the CENTURY 21 Marks, Defendant has made, and is believed to continue to make, use in interstate commerce of the CENTURY 21 Marks without Plaintiff's permission.

47.    Defendant's unauthorized use of Plaintiff's Marks has diluted, and continues to dilute, the distinctive quality of the CENTURY 21 Marks.

- 9 -

COMPLAINT FOR DAMAGES                                                    CASE NO.

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

48.     As evidenced by their refusal to cease further use of the CENTURY 21 Marks after notice that they must cease and desist further use of the CENTURY 21 Marks following the date of termination, the Defendant's use of the CENTURY 21 Marks following the date of termination was intentional, in conscious disregard of Plaintiff's rights, and constituted willful and knowing trademark infringement. Plaintiff is, therefore, entitled to an award of treble damages and/or enhanced profits from the Defendant.

49.     As a direct and proximate result of the foregoing conduct, Plaintiff is entitled to damages as against Defendant in an amount that is presently unknown, to a preliminary and permanent injunction, and to any and all other relief the Court deems just and proper under the law.

50.     Plaintiff is also entitled by statute and pursuant to the terms of the Agreement to an award of attorneys' fees and costs incurred in having to institute this legal action.

## FOURTH CLAIM FOR RELIEF

### (By All Plaintiffs For Common Law Trademark Infringement)

51.     Plaintiff incorporates by reference the allegations set forth above in paragraphs 1 through 23, as though fully set forth herein.

52.     The CENTURY 21 Marks are the proprietary property of Plaintiffs, who possess certain common law trademark rights and protections in the CENTURY 21 Marks.

53.     The CENTURY 21 Marks are an indicator of source and are associated with Plaintiff's goods and services.

54.     Defendant is aware of Plaintiff's rights in and to the CENTURY 21 Marks as an indicator of source.

55.     Even before the termination of the Agreement, however, Defendant was using the CENTURY 21 Marks outside the scope of his license by doing business as CENTURY 21 TODAY REALTY, constituting infringement and unauthorized use of the Marks.

56.     Pursuant to Section 16 of the Agreement, Defendant expressly agreed to discontinue further use of the CENTURY 21 Marks following the date of termination. Defendant was further informed by Plaintiff that, as of the date of termination of the Agreement,

- 10 -

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

1    he no longer had permission to use the CENTURY 21 Marks. However, despite Defendant's

2    agreement to discontinue further use of the CENTURY 21 Marks and actual knowledge that he

3    was no longer authorized to use the CENTURY 21 Marks following the date of termination, the

4    Defendant continued, and continues, to use the CENTURY 21 Marks in violation of Plaintiff's

5    exclusive rights to those Marks.

6          57.      The Defendant was consciously aware of the continued use of the CENTURY 21

7    Marks and has used the CENTURY 21 Marks to advertise and promote their real estate business

8    with full knowledge of Plaintiff's rights.

9          58.      The Defendant's unauthorized use of the CENTURY 21 Marks following the date

10    of termination to advertise and promote their real estate business infringes Plaintiff's common

11    law trademark rights in and to the CENTURY 21 Marks.

12          59.      Plaintiff has been damaged and will continue to be damaged by the Defendant's

13    infringing activities.

14          60.      As a direct and proximate result of the foregoing conduct, Plaintiff is entitled to

15    damages as against Defendant in an amount that is presently unknown, to a preliminary and

16    permanent injunction, and to any and all other relief the Court deems just and proper under the

17    law.

18          61.      Pursuant to the Agreement, Plaintiff is also entitled to an award of attorneys' fees

19    and costs incurred in having to institute this legal action.

20          62.      Plaintiff is informed and believes, and thereon alleges, that the Defendant's

21    conduct was willful, wanton, malicious, and in conscious disregard of Plaintiff's rights, thereby

22    justifying an award of punitive and/or exemplary damages in an amount according to proof at

23    trial.

24                           **FIFTH CLAIM FOR RELIEF**

25        **(Statutory Unfair Competition, Cal. Bus. & Prof. Code §§ 17200 et seq.)**

26

27          63.      Plaintiff incorporates by reference the allegations set forth above in paragraphs 1

     through 23, as though fully set forth herein.

28

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

- 11 -

1    64.    The Defendant has engaged in a pattern of unfair, deception, and fraudulent acts

2    to enrich himself by misappropriating the CENTURY 21 Marks and using them for his own

3    benefit.

4    65.    The Defendant's continued misappropriation of Plaintiff's rights to the

5    CENTURY 21 Marks following the date of termination by expiration of the Agreement

6    constitutes multiple violations of California Business and Professions Code §§ 17200 et seq.

7    66.    Plaintiff has actually been injured by Defendant's acts and have no adequate

8    remedy at law.

9    67.    Plaintiff has been damaged and will continue to be damaged by the Defendant's

10   unlawful, unfair and/or fraudulent business practices and misleading advertising as alleged

11   herein. Plaintiff is therefore entitled to a preliminary and permanent injunction enjoining the

12   Defendant from using the CENTURY 21 Marks in connection with his real estate business.

13   ## SIXTH CLAIM FOR RELIEF

14   **(By All Plaintiffs For Common Law Unfair Competition)**

15   68.    Plaintiff incorporates by reference the allegations set forth above in paragraphs 1

16   through 23, as though fully set forth herein.

17   69.    Plaintiff is the legal owner of the CENTURY 21 Marks. Despite knowledge of

18   Plaintiff's ownership interest in the CENTURY 21 Marks, the Defendant has made, and is

19   believed to continue to make, use in commerce of the CENTURY 21 Marks without Plaintiff's

20   permission and/or beyond the permission that Plaintiff granted.

21   70.    The Defendant has engaged in a pattern of unfair, deception, and fraudulent acts

22   to enrich himself by misappropriating the CENTURY 21 Marks and using said Marks for his

23   own benefit.

24   71.    The Defendant's unauthorized use of the CENTURY 21 Marks creates a false

25   association between the Defendant and Plaintiff and tends to cause confusion, mistake, and/or

26   deception among consumers as to the source, quality. and nature of their goods and services.

27   72.    Plaintiff is informed and believes, and thereon alleges, that the Defendant has

28   engaged in fraudulent business practices. false advertising, and unfair competition by using the

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles. CA 90071

- 12 -

CENTURY 21 Marks, associated good will, and other rights of Plaintiff, without permission and/or beyond the permission that Plaintiff granted, in an attempt to pass off the Defendant's services as being affiliated with or sponsored by Plaintiff.

73. Plaintiff has been damaged and will continue to be damaged by the Defendant's unlawful, unfair, and/or fraudulent business practices and misleading advertising as alleged herein. Plaintiff is therefore entitled to a preliminary and permanent injunction enjoining the Defendant from using the CENTURY 21 Marks in connection with the Defendant's real estate business.

74. As a direct and proximate result of the foregoing conduct, Plaintiff has been harmed and are entitled to damages as against Defendant in an amount that is presently unknown and to any and all other relief the Court deems just and proper under the law.

75. Plaintiff is informed and believes, and thereon alleges, that the Defendant's conduct was willful, wanton, and in conscious disregard of Plaintiff's rights, thereby justifying an award of punitive and/or exemplary damages in an amount according to proof at trial.

## SEVENTH CLAIM FOR RELIEF

### (Breach Of Contract)

76. Plaintiff incorporates by reference the allegations set forth above in paragraphs 1 through 23, as though fully set forth herein.

77. As set forth above, Plaintiff and Defendants entered into the Agreement whereby Plaintiff agreed to provide a non-exclusive license for its trademarks and marketing system and Defendant agreed to certain monetary and non-monetary obligations as more fully set forth in Exhibit A attached hereto.

78. Plaintiff has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Agreement except as excused by law.

79. Defendant has breached the Agreement in at least the following ways:

(a) failing to pay amounts owed under the Agreement;

(b) failing to report on closed transactions;

- 13 -

COMPLAINT FOR DAMAGES                                    CASE NO

1          (c)     unauthorized use of Plaintiff's CENTURY 21 Marks; and

2          (d)     failing to pay amounts calculated under the Agreements for liquidated

3                  damages.

4      80.    As a result of Defendant's breach, Plaintiff Century 21 has been damaged in an

5  amount to be proven at trial based on the facts alleged herein. Pursuant to the Agreement,

6  Plaintiff Century 21 is also entitled to an order requiring the Defendant to pay a royalty fee of six

7  percent (6%) and a NAF fee of two percent (2%) on all gross revenues the Defendant received

8  during the entire period following the date of termination in which the Defendant used the

9  CENTURY 21 Marks, as well as liquidated damages.

10     81.    Pursuant to the contractual calculations, Defendant owes Plaintiff no less than

11  $109,925.00 for past due royalties, NAF fees, and additional contractual damages in the

12  Agreement.

13     82.    Plaintiff Century 21 is also entitled under the Agreement to interest on these sums

14  pursuant to the interest rates set forth in the Agreement.

15     83.    Pursuant to the Agreement, Plaintiff is also entitled to the recovery of reasonable

16  attorneys' fees and costs if it prevails in this action.

17                          **EIGHTH CLAIM FOR RELIEF**

18                               **(Breach of Guaranty)**

19     84.    Plaintiff incorporates by reference the allegations set forth above in paragraphs 1

20  through 23, as though fully set forth herein.

21     85.    As set forth above, Plaintiff and Defendant entered into a Guaranty of all

22  obligations under the Agreement.

23     86.    Plaintiff has performed all conditions, covenants, and promises required on its

24  part to be performed in accordance with the terms and conditions of Agreement and the Guaranty

25  except as excused by law.

26     87.    As a result of Defendant's breach of the contracts, Plaintiff has been damaged in

27  the amount of not less than $109,925.00, plus interest, as set forth above, with additional

28

- 14 -

COMPLAINT FOR DAMAGES                                              CASE NO. _____

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

1 damages in an amount to be proven at trial based on the facts alleged herein, which Defendant is

2 obligated to pay.

3     88.     Pursuant to the Agreement, Plaintiff is also entitled to the recovery of reasonable

4 attorneys' fees and costs if it prevails in this action.

## NINTH CLAIM FOR RELIEF

### (Quantum Meruit)

7     89.     Plaintiff incorporates by reference the allegations set forth above in paragraphs 1

8 through 23, as though fully set forth herein.

9     90.     Within the last two years, Plaintiff provided services to Defendant, including, but

10 not limited to, non-exclusive licenses to use Plaintiff's trademarks, Plaintiff's marketing system

11 and other proprietary information and property of Plaintiff. Defendants knew that these services

12 were being provided and accepted, used, and enjoyed the services provided by Plaintiff.

13     91.     The fair and reasonable value of the services provided to the Defendants is at least

14 $109,925.00, with interest accruing thereon at 18% or the highest rate permitted under the law,

15 whichever is less, with additional damages in an amount to be proven at trial based on the facts

16 alleged herein.

17     92.     Plaintiff is also entitled to recovery of reasonable attorneys' fees and costs.

## TENTH CLAIM FOR RELIEF

### (By Plaintiff Century 21 For Accounting)

21     93.     Plaintiff incorporates by reference the allegations set forth above in paragraphs 1

22 through 23, as though fully set forth herein.

23     94.     As set forth above in detail, Plaintiff Century 21 and Defendant entered into a

24 franchise relationship based on execution of the Agreement attached hereto as Exhibit A and

25 incorporated by reference herein as though fully set forth. Pursuant to the Agreement, Defendant

26 entered into, among other things, certain financial obligations to Plaintiff Century 21 including:

27 payment to Plaintiff of six percent (6%) royalty fees of all of Defendant' gross revenues under

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

- 15 -

1  Section 7 of the Agreement, and two percent (2%) of gross revenues for the National Advertising

2  Fund ("NAF") under Section 8 of the Agreement.

3      95.    Plaintiff Century 21 is informed and believes, and thereon alleges, that Defendant

4  owes sums under the Agreement based on, among other things, unauthorized sales of real estate

5  under the CENTURY 21 Marks not reported by Defendant but for which a royalty fee and NAF

6  fee is due and owing. However, Plaintiff Century 21 is unable to ascertain this amount without

7  an accounting or audit of the books and records of the Defendant. The additional amounts owed

8  are within the knowledge of the Defendant as these amounts are based on transactions in which

9  Defendant participated.

10      96.    Plaintiff Century 21 has demanded an accurate accounting of any additional sales

11  transactions or amounts that may be owed to Plaintiff, and Defendant have refused to provide

12  this information.

13  ### PRAYER FOR RELIEF

14      WHEREFORE, Plaintiff respectfully requests judgment against the Defendant as follows:

15      1.    That the Defendant owes and is obligated to pay to Plaintiff Century 21 monetary

16  damages in an amount not less than $109,925.00, plus interest accruing thereon, for past unpaid

17  obligations including, royalty fees, NAF fees, and other fees that are due under the Agreement.

18      2.    That the Defendant owes and is obligated to pay to Plaintiff Century 21 any

19  additional compensatory damages resulting from the breach of the Agreement, subject to proof at

20  the time of trial.

21      3.    That the Defendant owes and is obligated to pay to Plaintiff Century 21 the

22  amount of the reasonable attorney fees and costs Plaintiff incurred in this action, subject to proof

23  at the time of trial.

24      4.    That Defendant owes Plaintiff Century 21 an accounting of additional sums based

25  on the Agreement between the parties and within the knowledge of Defendant.

26      5.    Any additional sums owing to Plaintiff Century 21 resulting from accounting

27  based upon the Agreement.

28

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

- 16 -

6.    For an Order that, by the acts complained of, the Defendant have infringed Plaintiff's trademark rights in violation of 15 U.S.C. § 1114.

7.    For an Order awarding Plaintiff's general and/or specific damages, in an amount to be fixed by the Court in accordance with proof, including enhanced and/or exemplary damages, as appropriate, as well as all of the Defendant's profits or gains of any kind from their acts of trademark infringement, common law trademark infringement, unfair competition, and false advertising; and further for an award that such acts were willful and wanton, thereby justifying an award, where appropriate, of treble or enhanced damages.

8.    For an order that the Defendant owes and is obligated to pay to Plaintiffs a royalty fee of six percent (6%) and a National Advertising Fund fee of two percent (2%) on all gross revenues the Defendant received during the entire period following the date of termination in which they used the CENTURY 21 Marks.

9.    For an order awarding Plaintiffs treble the Defendant's profits, or treble Plaintiff's damages, whichever is greater, pursuant to 15 U.S.C. § 1117(b), for the Defendant's knowing and intentional use of counterfeit CENTURY 21 Marks.

10.    For an order awarding statutory damages for each willful use by the Defendant as the Court deems just, pursuant to 15 U.S.C. § 1117(c).

11.    For an order that, by the acts complained of herein, the Defendant has engaged in false designation of origin and false advertising, in violation of 15 U.S.C. § 1125(a).

12.    For an order that, by the acts complained of herein, the Defendant has infringed Plaintiff's common law trademark rights.

13.    For an order that the Defendant's conduct, as complained of herein, was willful, wanton, malicious, and in conscious disregard of Plaintiff's rights, thereby justifying an award of punitive and/or exemplary damages in an amount according to proof at trial.

14.    For an order that, by the acts complained of herein, the Defendant, and each of them, have engaged in unfair competition against Plaintiffs, in violation of California Business and Professions Code sections 17200 et seq.

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

- 17 -

1      15.    For an order that, by the acts complained of herein, the Defendant has engaged in

2  unfair competition against Plaintiffs in violation of the common law of California.

3      16.    For preliminary and permanent injunction enjoining the Defendant and his agents.

4  servants, employees, and all persons acting in concert with them from:

5          a.    Using the CENTURY 21 Marks in marketing, advertising, or promotional

6             materials or otherwise in connection with the Defendant's real estate

7             business;

8          b.    Otherwise infringing the CENTURY 21 Marks; and

9          c.    Causing likelihood of confusion, deception, and/or mistake as to the

10             source, nature, and/or quality of the Defendant's goods and services.

11      17.    For an order directing the Defendant to file with the Court and serve on Plaintiffs

12  within thirty (30) days after service of an injunction, a written report, signed under oath, setting

13  forth in detail the manner and form in which the Defendant has complied with the injunction.

14      18.    For an order awarding Plaintiffs its costs and attorneys fees incurred in

15  prosecuting this action.

16      19.    For an order awarding Plaintiffs pre- and post-judgment interest.

17      20.    For an order awarding Plaintiffs such other relief that the Court deems just and

18  proper.

19  Dated: June 14, 2007                GORDON & REES LLP

20

21                            By:_____

22                             PHILLIP K. WANG

23                             MORGAN V. ANDREWS
                           Attorneys for Plaintiffs

24                             CENTURY 21 REAL ESTATE LLC

25

26

27

28

- 18 -

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

# Exhibit A





Office I.D. No. **301121-0001**

## CENTURY 21 REAL ESTATE LLC
## REAL ESTATE FRANCHISE AGREEMENT

**1.0**    **PARTIES AND TERM (Certain terms are defined in Section 3):**

**1.1**    **Franchisor.** The word "Franchisor," "we," or "us" means:
**Century 21 Real Estate LLC**, a Delaware limited liability company, its successors and assigns

By: _____    Date: _____ ,200 5
     Cynthia L. Kelly                (the "Acceptance Date")
     **Senior Vice President**
     **Franchise Sales and Administration**

**1.2**    **Franchisee.** The word "Franchisee," or "you" means:

**1.2.1**    **If Franchisee is an entity:**

(State of Organization: )

By:_____    Date:_____
Name:
Title:

**1.2.2**    **If Franchisee is a sole proprietor:**

Signature:_____    Date: _____
Print Name: Sakhawat Jaffery, Individually
State of Residence: California

**THIS AGREEMENT SHALL NOT BECOME EFFECTIVE UNTIL IT IS EXECUTED BY AN AUTHORIZED CORPORATE OFFICER OF CENTURY 21, AND THE INITIAL FRANCHISE FEE HAS BEEN PAID.**

**1.3**    **Owners.** The words "Owner" and "Owners" mean the sole proprietor (in his or her capacity as the sole proprietor) or each Person who has a direct equity ownership interest in Franchisee (if Franchisee is an entity). Franchisee represents and warrants that:

**1.3.1**    The following Persons own all of Franchisee's equity ownership interests as stated below.

C21 Ex C 05/05                    1                    155132.8
C21 301121-0001




| Name: | Social Security # | Ownership Interest: |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**1.3.2**   If any Owner is an entity, information about the individuals directly or indirectly beneficially owning such entity and their ownership interests appears in Exhibit A, which is ☐ or is not ☒ attached as of the signing of this Agreement.

**1.4   Personal Guaranty.**  To induce Franchisor to enter into this Agreement, the Owners have executed and delivered the Personal Guaranty of the payment and performance of Franchisee's obligations under this Agreement attached as Exhibit B (the "Personal Guaranty").

**1.5   Term of Agreement.**  This Agreement becomes a binding agreement upon execution by us (the "Acceptance Date"). You understand that this Agreement will not become effective unless and until signed by our authorized officer. The performance period shall start on the Effective Date (as defined in Section 1.7) and shall expire at 11:59 p.m. on the day preceding the tenth anniversary of the Effective Date (the "Expiration Date"). The period commencing on the Effective Date and ending on the Expiration Date is the "Term" of this Agreement.

**1.6   Initial Franchise Fee:**

**1.6.1**   Concurrently with the execution of this Agreement, you shall pay us at our principal office, or at such other place as we may designate, in cash, unless otherwise permitted in writing by us, an initial franchise fee in the amount of **$25,000.00**. For all additional offices opened by you, you shall pay to us in cash an initial franchise fee per office equal to $10,000.

**1.6.2**   The initial franchise fee is fully earned on the Acceptance Date and is not refundable.

**1.7   Effective Date.**  You will commence operation of the Business at the Office using the System on **September 01, 2005** (the "Effective Date"). All closings that occur on and after the Effective Date will be subject to fee payments as provided in Sections 7 and 8, below. Failure to commence operation using the Marks and the System by the above date shall be a material breach of this Agreement. If you identify the Office as a CENTURY 21 office or operate the Office under the Marks before the Effective Date without our express written consent, then in addition to our remedies under Section 16, you will begin paying the fee payments as specified in Sections 7 and 8 from the date you identify or operate the Office using the Marks. We may delay the Effective Date until you pay the Royalty Fees or NAF contributions accruing under this Section.

**2.0   FRANCHISEE INFORMATION:**

**2.1   Business Name.**  You shall operate under the trade name "CENTURY 21 **Saks Team**," (hereinafter called your "trade name") and shall use no other name in connection with any operations conducted at or from the location specified in Section 2.4 or on computer communication services such as the Internet without our prior written approval. In every visual display in which the CENTURY 21 logo is used the portion of your trade name immediately following the words "CENTURY 21," or other approved words, shall be as required in the P&P Manual, and the total appearance of your trade name and other identifying words must be approved in advance in writing by us. We reserve the right to review and require corrections

  

and modifications to any display of your trade name or our Marks. Our failure to promptly require corrections of, or modifications to, your improper use of your trade name or our Marks shall not be deemed a waiver of our right to do so.

**2.1.1** You agree that throughout the Term of this Agreement you will operate exclusively under your trade name with respect to all advertising, promotion and communications, including, but not limited to, telephone answering, office sign(s), yard signs, business cards, bank accounts, stationery, promotional and advertising materials, real estate documents, the Internet, and all other materials used in any medium by you. You shall comply, at all times throughout the Term of this Agreement, with all guidelines instituted by us concerning your authorized use and/or presentation of the Marks (including any derivative) and the System on the Internet or other communication systems.

**2.1.2** You shall file and keep current, in the county and/or state in which your Office is situated and at such other places as may be required by law, a "Fictitious Name Certificate," or comparable instrument, with respect to your trade name under which you have been approved to operate by us. Prior to opening an office under said trade name, you shall supply evidence satisfactory to us that you have complied with all relevant laws regarding the use of fictitious or assumed names. Once established, you may not change your legal entity or trade name without our prior written permission.

**2.1.3** You shall use your trade name and such other Marks as you may be authorized to use from time to time, exclusively for the purpose of promoting and operating the Business, and for such other lawful business activities as may have been authorized previously in writing by us; provided, however, that we have no obligation to authorize any such additional business activities.

**2.2     Legal Entity.** If you are an entity, you represent and warrant that it was duly formed under the laws of the jurisdiction stated in Section 1.2.1 and that it validly exists and is in good standing under such laws and the laws of the jurisdiction where the Office is located. You shall not include the words "Century 21" as part of your legal name.

**2.3     Responsible Broker.** The "Responsible Broker" is your licensed real estate broker as required under the laws of the state in which the Office is located. No change in the Responsible Broker shall be made without you and your proposed new Responsible Broker having complied with the provisions of this Agreement. If the Responsible Broker resigns or is terminated, you shall appoint a replacement Responsible Broker within 10 days of the resignation or termination or such shorter period as may be required by law. If you do not name a replacement Responsible Broker within such period, you shall suspend performance, and we may suspend performance, under this Agreement until you retain a replacement Responsible Broker. The name of the initial Responsible Broker is:

Print Name: **Heiko Stichel**

You shall not substitute a new Responsible Broker without our prior written consent, which shall not be unreasonably withheld.

**2.4     Office.** The Business shall be operated exclusively by you and only from the Office location identified in this Section, and you shall not operate any other business and shall not engage in any other activity at or from the Office. You shall effect or announce no change in the Office location without our prior written consent in accordance with Section 5.1 of this Agreement. The word "Office" in this Agreement refers only to the location identified by the following address and telephone number(s):

Street Address:             **2075 De La Cruz Blvd.**
City, State and Zip Code: **Santa Clara, CA 95050**

 

Telephone Number:   **(408) 314-0485**
Fax Number:         (    )

**2.5     Notice Address.** All notices required under this Agreement must be in writing, to the address stated below, and will be deemed given:

**2.5.1**   if personally delivered to the respective party at the address specified below (or at such other address as a party may subsequently designate for itself by notice to the other party), or

**2.5.2**   if deposited in the United States mail, by certified mail, postage prepaid, and addressed to the respective party at the address specified below (or at such other address as a party may subsequently designate for itself by notice to the other party),

**2.5.3**   if delivered by courier or an express delivery service (such as DHL Express or FedEx), or

**2.5.4**   if faxed, provided that a confirmation copy of any fax transmission is mailed to the respective party via first class United States mail:

Notices to Franchisee shall be sent to:

Street Address:             **2075 De La Cruz Blvd.**
City, State and Zip Code:   **Santa Clara, CA 95050**
Fax Number:                 (    )

Unless otherwise specifically provided in the P&P Manual (as defined in Section 3.1.10), notices to Franchisor shall be sent to:

Century 21 Real Estate LLC
Attention: Senior Vice President, Franchise Administration
1 Campus Drive
Parsippany, NJ 07054
Fax Number: (973) 496-5641

Any notice will be considered given as of the date personally delivered or faxed or three business days after the date of deposit in the United States mail, as the case may be. Either party has the right to change their address for notice by giving written notice as provided in this paragraph.

**3.0     INTERPRETATION:**

**3.1     Certain Definitions.** This Agreement assigns the meanings below to the following words and phrases unless the context indicates otherwise:

**3.1.1**   "Ancillary Services" means services which are not directly related to the Business contemplated by this Agreement, including without limitation, title insurance or searches, mortgage banking, loan brokerage, insurance, escrow or appraisals.

**3.1.2**   "Business" means the operation of a real estate brokerage in accordance with the terms and provisions of this Agreement.

**3.1.3**   "Cendant" means Cendant Corporation, our ultimate parent company, its successors and assigns.

 

**3.1.4**  Intentionally deleted.

**3.1.5**  "Confidential Information" means information owned or licensed by us and involving the operation of the Business, including without limitation, the P&P Manual, electronic communications identification numbers, procedures related to our proprietary communications and referral systems, and other methods and information. Confidential Information does not include information lawfully in the public domain, and information disclosed without an obligation regarding confidentiality by a party other than you or an Owner.

**3.1.6**  "Franchise Offering Circular" means our Uniform Franchise Offering Circular used in the offer and sale of franchises in your state in effect at the time.

**3.1.7**  "Gross Revenue" means all monies or things of value, calculated at their fair market value in United States currency, received or receivable (i.e., earned but not yet received) by you (including, without limitation, all revenues and commissions received by or on behalf of your independent sales associates, agents, representatives, contractors, employees, partners, directors, officers, Owners, or corporations or other entities which control, are controlled by, or are under common control with you or your other affiliates (collectively, "Affiliate(s)") regardless of whether or not such individuals or entities are entitled to retain all or part of such revenues or commissions), directly or indirectly, in connection with the Business including, but not limited to, transactions and provision of services for which a real estate or auctioneer's license (including appraisal, title or escrow services) is required, the sale or provision of products or services that we or any of our affiliates develop or make available to you directly or through a third party and/or any transaction, sale and/or service in which the Marks or the System is used in any manner, without deducting any of your multiple listing fees, advertising costs, commissions, overrides, bonuses, salaries, gifts, or any other costs or expenses, except outgoing referral fees paid to: (i) other licensed real estate brokers operating under an existing franchise agreement with a Cendant subsidiary or affiliate and (ii) any other referral networks owned or operated by Cendant and/or any of its direct or indirect subsidiaries and affiliates.

**3.1.8**  "Marks" means the trademarks, service marks and trade dress that we authorize you to use, in the P&P Manual, including all additional or substitute trademarks, service marks and trade dress that we may authorize you to use.

**3.1.9**  "Person" means an individual, a partnership, a trust, a corporation, a limited liability company, an association and any other incorporated or unincorporated organization or entity.

**3.1.10**  "P&P Manual" means our confidential manual(s) of policies, procedures, Standards, know-how, business methods and other information relevant to the Business and the System. In the event of any conflict, discrepancy or ambiguity between the provisions of this Agreement and the provisions of the P&P Manual, the terms and provisions of this Agreement shall prevail and control.

**3.1.11**  "Related Party" means a Person who, directly or indirectly, owns or controls a Person, is owned or controlled by a Person, or is under common control with a Person. Control, in this context, means the possession of executive power to direct or to cause the direction of the management and policies of a Person, whether through voting power, ownership, by contract or otherwise.

**3.1.12**  "Royalty Fee" has the meaning in Section 7.1.

**3.1.13**  "Standards" means our mandatory specifications, standards, methods and procedures prescribed by us in the P&P Manual or this Agreement.



3.1.14 "System" means the business format and methods developed or licensed by us for the promotion and assistance of independently owned and operated real estate brokerage offices, including policies, procedures and techniques designed to enable such offices to compete more effectively in the real estate sales market. The System includes common use and promotion of certain Marks, copyrights, trade secrets, centralized advertising programs, recruiting programs, referral programs and sales and management training programs. We may update the System at any time and expect to continue to do so as we deem advisable in our sole judgment and discretion.

## 4.0  GRANT OF LICENSE:

**4.1  License; Policy and Procedure Manual.** As of the Effective Date, we grant you a nonexclusive license (i) to use the Marks for the Business at and from the Office and to hold the Business out to be a participant in the System, and (ii) to use the System for the operation of the Business at and from the Office. You accept the nonexclusive license granted by us, subject to the terms and conditions of this Agreement and the P&P Manual as amended from time to time. We will provide to you during the Term access to the P&P Manual, which may consist of one or more publications or may be provided electronically. The P&P Manual contains our standards and recommended methods, specifications and procedures relating to the use and protection of the System. We may modify the P&P Manual, at our discretion, from time to time to reflect changes in the System. We shall provide you with all such modifications and you agree to maintain your copy of the P&P Manual current, if the manual is published. If a dispute develops relating to the contents of the P&P Manual, the master copy that we maintain at our principal office, or the most current edition maintained on our Intranet site, will be controlling. A copy of any part of the P&P Manual may be made for your internal use; the use of any such copy shall be subject to the applicable provisions of this Agreement.

**4.1.1**  The System shall not include:

> **4.1.1.1** any real estate or other investment syndication business of any kind, and you shall not engage in any such syndication business during the Term;

> **4.1.1.2** the offering or performing of Ancillary Services. You may offer and perform Ancillary Services in a manner consistent with applicable law and the P&P Manual; however, you are not authorized to use the Marks or the System in any manner in connection with any Ancillary Services, except with our prior written consent and subject to certain terms and conditions which we may impose, including, but not limited to the requirement that you do not hold yourself out to the public as providing any Ancillary Service as your primary or principal business or as being a stand-alone provider solely of any Ancillary Service. In the event any Ancillary Service is offered or performed in conjunction with the direct or indirect use of the Marks or System without our written consent and/or inconsistent with any conditions we may impose, in addition to any other rights and remedies we may have, any revenue received from such products or services shall be considered Gross Revenue;

> **4.1.1.3** In the event any Ancillary Services are offered or performed in conjunction with the direct or indirect use of the Marks or System, any revenue received from such products or services shall be considered Gross Revenue.

**4.2  Program Expansion and Modification.** We intend, as conditions permit, to modify existing programs and to introduce new programs. We intend to make new programs available generally to those franchisees operating under franchise agreements that are the same or substantially similar to the form of franchise agreement being marketed to our franchisees at the time we implement the programs nationally.

  

We reserve the right to modify, add to, qualify, or eliminate programs as we deem are in the best interests of the System.

**4.3    Participation in Programs.** We may condition participation in the programs upon your compliance with certain requirements, including payment of all your financial obligations to us when due under the Agreement or otherwise, maintenance of specified program standards, successful completion of any educational programs required by us and payment of a separate fee to participate in all or some of the programs. Only franchisees meeting all program requirements are authorized to utilize the Marks or other identifications that are unique to the program.

**4.4    Identification and Use of Marks.**

4.4.1    You acknowledge that we have the exclusive right to use and sublicense the Marks, and that the System and other products and items delivered to you pursuant to this Agreement are our sole and exclusive property and that your right to use the same solely in connection with the operation of the Business is contingent upon your continued full and timely performance under this Agreement. You shall be responsible for, and supervise all of your Affiliates in order to assure, the proper use of the Marks and the System in compliance with this Agreement. You acquire no rights in any of said property, except for your right to use the same under this Agreement. You agree that at no time during this Agreement or at any time after the expiration or termination of this Agreement shall you contest in the United States or any other country our sole and exclusive rights in said Marks and System and other products and items delivered under this Agreement, nor shall you claim any interest therein that is contrary to this Section or at any time dispute, disparage or impugn the validity of the Marks and/or the System. In addition, you acknowledge and agree that you shall be required to comply throughout the term of this Agreement with all guidelines instituted by us concerning authorized use and/or presentation by you of the Marks and the System on the Internet or other communication systems. You acknowledge that such guidelines will prohibit your use of the Marks or any other derivative word or mark on the Internet or other computer communications service in connection with your identification and the operation of the Business other than in compliance with your trade name and in compliance with the P&P Manual. You agree that neither during the term of this Agreement nor at any time after its expiration or termination shall you adopt or employ, or seek to register, any names, marks, insignias, colors, trade dress, URLs, or symbols in the franchise operations or any other business that are confusingly similar to the Marks licensed under this Agreement that are not in compliance with the provisions of this Agreement and/or the P&P Manual. Furthermore, you agree to cooperate with and assist us in connection with any legal action brought by or against us either regarding the protection and preservation of said Marks and System and other products and items delivered under this Agreement. We may undertake from time to time to determine if you are meeting our standards for usage of the Marks. You will promptly correct whatever deficiencies we find to exist.

4.4.2    We reserve the right to approve any and all public uses of the Marks, other than those used on our prepared materials. All use of the Marks will inure to our benefit. You acknowledge that we or an affiliate is the sole owner of the Marks and that you will not challenge the validity of the ownership of the Marks or our right to license them to you. At our sole option, we or an affiliate will obtain and maintain its registrations for the Marks and exercise the rights against infringement or unauthorized use of the Marks. You will use or display the Marks solely in connection with the operation of the Business provided for under this Agreement and with no other business, activity or enterprise unless you received our prior written consent. Any use of the Marks to promote any other business, activity or enterprise, irrespective of whether we have given our consent, shall be considered as included within the definition of Gross Revenue upon which a Royalty Fee and NAF contribution shall be payable. You agree to supervise all persons working with or under you



in the franchised operation to assure compliance by such persons with all the terms of this Agreement and the P&P Manual.

**4.5    Office Appearance.** You may be required at our discretion to make reasonable alterations, modifications or upgrades to the office space in which the Business is to be operated.

**4.6    Office Sign.** You shall install one or more internally lighted exterior signs displaying your trade name, as set forth in Section 2.1 hereof, at the Office, which sign(s) must conform to the standards and specifications set forth in the P&P Manual, and which SIGN MUST BE APPROVED IN WRITING IN ADVANCE AS TO ARTWORK, LETTERING, COLOR SCHEME, SIZE, CONSTRUCTION AND OVERALL APPEARANCE BY US. Any exception to Office sign requirements because of local sign ordinances or other reasons must first be approved in writing by us.

**4.7    Regular Business Hours.** During the term of this Agreement, you shall diligently, faithfully and continuously conduct the Business at the Office, which shall be open during regular business hours at least six days per week. You also agree to give prompt, courteous and efficient service to the public, and generally to operate the Business in compliance with the P&P Manual and professional standards so as to preserve, maintain and enhance the value of the Marks and the System and the reputation and goodwill built up by us and by our franchisees. Also, you agree to maintain throughout the term of this Agreement all office facilities, equipment, office sign(s), yard signs and all other materials in first-class condition, and to keep them in strict compliance with the P&P Manual.

**4.8    Disclaimer.** You shall place a conspicuous placard or decal on or near the door to the front entrance of the Office, which complies with the standards and specifications set forth in the P&P Manual, which has been approved in writing by us, and which clearly states: "EACH OFFICE IS INDEPENDENTLY OWNED AND OPERATED." Further, you specifically agree to include conspicuously the slogan "EACH OFFICE IS INDEPENDENTLY OWNED AND OPERATED" on all signage, business cards, stationery, promotional and advertising materials, including the Internet and other communications, real estate documents, and all other materials used by you, unless specifically provided otherwise in the P&P Manual or waived in writing by us.

**4.9    Yard Signs.** You shall purchase or lease an adequate quantity of yard signs displaying your trade name and such other information as may be required by law and is in compliance with the standards and specifications in the P&P Manual. You will provide within 60 days after the Acceptance Date either color photographs of the signs or a copy of the order for the signs.

**4.10    Stationery Goods.** You shall purchase adequate supplies of business cards, stationery, promotional materials and related items, which display your trade name and other information, and all of which comply with the standards and specifications of the P&P Manual.

**4.11    Confidentiality.** You acknowledge that all of the information you now have or obtain in the future regarding the System and the concepts and methods of promotion are part of the System and you will treat as confidential all information disclosed to you in confidence. You will never directly or indirectly engage in or aid in the misappropriation, disclosure, divulgence or distribution of any part of the System or the concepts and methods of promoting our franchises. You will use such manuals, programs and materials solely in connection with the operation of the Business and your Franchise and will not direct or permit their copying or reproduction without our express prior written consent. You also will require all your management personnel employed in the Business and your licensed sales associates to treat that information as confidential.

**5.0    OFFICE LOCATIONS:**

  

**5.1** **Relocation of Office.** In the event that you seek to change the Office location, you shall submit, no later than 30 days before the date upon which you desire to change location, a written request to us specifying:

**5.1.1** the requested new location, including photographs of the requested new location;

**5.1.2** the reason(s) you seek a new approved location; and

**5.1.3** any other factors which you believe are relevant to our decision to approve or disapprove the new location. We shall not unreasonably withhold our approval of your application to relocate the Office to another location that is in the general vicinity of the Office location subject to our then current policy and procedure for office relocation.

**5.1.4** You and your Related Parties and Owners shall be in compliance with this Agreement, the P&P Manual and all other agreements with us or any of our Related Parties in order for us to consider any new location request.

**5.2** **Exclusivity.** During the term of this Agreement, we shall not grant another franchised CENTURY 21 office at a location which is within .25 mile (measured in a straight line, "as the crow flies," between exterior office walls) of your Office. You acknowledge that the franchise granted by this Agreement covers only the Office described in Section 2.4 and does not in any way convey or imply any area, market, territorial rights, or protected area proprietary to you. This Agreement shall not be construed as granting you any right to purchase any additional franchise from us, or as granting any right or priority as to the location of any additional franchise that may be granted by us. If we enter into any other agreement with you for any other location, such agreement shall be on such terms as we then shall establish. Except as otherwise expressly provided in this Agreement, we and our Related Parties retain all of our rights and discretion with respect to the Marks, the System and other real estate offices, including without limitation, the rights to:

**5.2.1** Operate and grant to others the right to operate real estate offices identified by the Marks, at such locations within or outside of your market area, and on such terms and conditions as we or any of our Related Parties deems appropriate;

**5.2.2** Sell any products or services under the Marks, or under any other trademarks, service marks or trade dress, through other channels of distribution;

**5.2.3** Operate and grant others the right to operate real estate offices located anywhere (whether owned by us or any Related Party, franchisee or licensee of ours) that are part of a franchise system, affiliation or group of real estate offices that are open and operating (or under contractual commitment for development) at the time when we or any Related Party, directly or indirectly, acquire such offices and/or acquire the rights of the franchisor or licensor of such offices, regardless of whether such offices operate (or are converted to operate) using any or all of the Marks and/or any or all of the System or whether such offices operate under other trademarks, service marks or trade dress, and/or use other marketing and operating systems; and

**5.2.4** Operate and grant to others the right to operate real estate offices identified by trademarks, service marks or trade dress other than the Marks, at such locations within or outside of your market area, and on such terms and conditions as we or any of our Related Parties deem appropriate.

 

**5.3    Additional Offices.** If you seek to operate the Business from an additional office (the "Additional Office"), such Additional Office must be identified and authorized in a separate agreement. To be eligible to apply for an Additional Office, you must be in compliance with this Agreement and all other agreements with us or any of our Related Parties, including all·financial obligations. The acceptance or rejection of an application submitted by you for an Additional Office shall be at our sole discretion.

**5.4    Special Offices.** We, in our sole discretion, may establish and modify from time to time special categories of business locations, for example, locations open only on a seasonal basis or locations authorized to offer limited categories of services. Conditions relating to the opening, operation and closing of such special locations, including without limitation, signage, permitted services, the payment of fees and the like, may be set forth in the P&P Manual or in separate agreements. In each instance, we may require you to sign an addendum or amendment to this Agreement or a new franchise agreement in the form then being offered by us for additional offices, for a period of time that may be less than or equal to the remaining Term of this Agreement. The operation of your Business from special offices may contain some restrictions.

**6.0.    SERVICES AND OBLIGATIONS TO FRANCHISEE:**

**6.1    Our Initial Obligations.** Within a reasonable time after the Acceptance Date:

**6.1.1    Methods and Techniques.** We will impart to you our real estate brokerage, selling, promotional and merchandising methods and techniques associated with the System, and shall maintain a staff to give assistance and service to you.

**6.1.2    Promotional Materials.** We will publish and distribute from time to time a supply manual suggesting sources of supply for forms, signs, cards, stationery and other items necessary to operate a modern real estate brokerage business. The suggested source of supply for items may be us, or an affiliate of ours, or an independent supplier. You may purchase supplies either from a source of supply suggested by us or from any other supplier that can first demonstrate to our satisfaction that its products or services meet the specifications established from time to time by us.

**6.1.3    Orientation Training; International Management Academy.** You, or your designee, who shall have been approved in writing by us, shall attend the first available new franchisee orientation and management training program, offered by us, at the location and time designated by us (which program may occur subsequent to your opening of the Office). If an office manager will operate the Office for you, the office manager must also attend orientation. You acknowledge that, except in the case of an assignment, we shall pay for certain of your expenses incurred in connection with attendance at this program (enrollment package), except for incidental expenses not covered or included in the enrollment package. Attendance at this program is voluntary upon your purchase of a franchise other than for your initial Office, but is mandatory for the assignee in any assignment of the Agreement. In the case of assignment or purchase of another franchise other than for the initial Office, you are responsible for all costs incurred in connection with attendance at the program, including the enrollment package, transportation, lodging, program costs and incidental expenses. You understand that our obligation shall be to pay for only one enrollment package, notwithstanding the fact that the franchise may be owned by more than one individual or that an individual may control more than one franchise.

**6.2    Continuing Obligations.**

**6.2.1    Additional Training.** We will operate a sales training program on a periodic basis for System franchisees and their sales personnel at a location or locations selected by us. This program will

  

include seminars and conferences of special interest to be held as we deem necessary or advisable, relating to such topics as market conditions, sales motivation, sales aids, advertising and financing. We may charge a registration fee or other fee for such programs, seminars and conferences.

**6.2.2    NAF Contributions.**  We agree to contribute timely to the National Advertising Fund ("NAF"), as further described in Section 8, an amount of our own funds equal to 10% of the net royalty fees received from you. Notwithstanding the foregoing, we will make no such contributions to the NAF if annual Royalty Fees payable by you to us, net of your CENTURY 21 Incentive Bonus ("CIB") calculated in accordance with Section 7.3, are less than 5.5% of your Gross Revenue for such period or for any NAF contributions made more than 90 days after the date of the transaction for which the contribution was due.

**6.2.3    Other Obligations.**  We reserve the right to introduce and make available to you and others real estate related services and products, including but not limited to those related to mortgage origination, insurance, home warranties, and communications systems. We will give you written notice that such product or service is available. The written notice will also provide that said service or product may be utilized by you in the operation of the Business. If we advise you that such product or service is an essential element of the Business, as we may determine, and accordingly must be utilized, you will, at your sole expense: (i) obtain all necessary equipment, products or services which we advise you is necessary for the utilization of such product or service, including, but not limited to, computer hardware and software; and (ii) begin using such product or service within 90 days after your receipt of said written notice. Essential elements of the Business (and mandatory products or services relating thereto) under this Agreement will be limited to products and/or services which involve accounting or reporting functions or communications systems for the System. In the event we advise you that such product or service may be utilized, and you elect to so utilize said product or service, you will, at your sole expense, obtain all necessary equipment, products or services which we advise you is necessary for the utilization of such product or service, including, but not limited to, computer hardware and software. Nothing in this Section shall create any obligation on our part to introduce or make any such services or products available to you.

**6.2.4    Optional Programs.**  We, in our sole discretion, may develop, implement, modify and/or discontinue optional programs to enhance the Business. Furthermore, we shall have the right, in our sole discretion, to condition your participation in any one or more of such programs upon you and your Owners and Related Parties being in compliance with this Agreement and all other agreements with us or any of our Related Parties.

**7.0    FRANCHISE ROYALTIES:**

**7.1    Royalty Fee.**

**7.1.1**    You agree to pay us at our principal office, or at such other place as we may designate, in addition to the initial franchise fee set forth above in Section 1.6.1, a "Royalty Fee" equal to 6% of the Gross Revenue earned, derived and/or received by you and Gross Revenue earned, derived and/or received by your Affiliates described in Section 3.1.7, during the Term of this Agreement. All closings that occur on or after the Effective Date will be subject to the Royalty Fee and upon expiration or termination of this Agreement, Royalty Fees shall remain payable as to all transactions entered into, including pending transactions or sales contracts made, prior to the date of such expiration or termination.

**7.1.2**    Royalty Fees are due and payable in United States currency upon the settlement or close of escrow of each transaction, including previously pending transactions, that occur or sales

 

contracts that are made, on or after the Effective Date and which generate Gross Revenue. Your regularly charged brokerage commission or fee shall be imputed with respect to transactions involving any of your Affiliate(s) acting as a principal for purposes of computing the Royalty Fee payable to us in connection with such transactions.

**7.1.3** The only transactions on which Royalty Fees are not required to be paid are those for which revenues are received as a result of activities dealing with leases or rentals having a nonrenewable term of not more than one year and from property management services and Broker Price Opinions, unless more than 25% of your annual Gross Revenue are derived from property management services and Broker Price Opinions, in which case Royalty Fees shall be paid on 100% of your Gross Revenue from property management services and Broker Price Opinions. Notwithstanding the foregoing, we, at our option, may require a periodic report of your Gross Revenue derived from property management services and Broker Price Opinions. We reserve the right to establish procedures from time to time for verifying and processing said Royalty Fees. The term "Broker Price Opinions" shall mean standard, non-substantive residential value estimates issued to financial institutions or others for a nominal fee (usually $50 to $100 each) and does not include appraisal or other substantive estimates or opinions of value. "Property Management" excludes activities dealing with leases or rentals having a nonrenewable term of not more than one year and includes, but is not limited to, services such as repairs, rent collection, accounting, reporting, resident relations, marketing and outdoor management.

**7.1.4** Commencing with the first full calendar month following the Effective Date, there shall be a minimum monthly Royalty Fee of $500 per Office (the "Minimum Monthly Royalty Fee"). In the event the aggregate Royalty Fee paid to us during any calendar month totals less than the Minimum Monthly Royalty Fee, you shall pay to us, not later than the 10th day of the following calendar month, the difference between the Minimum Monthly Royalty Fee and aggregate Royalty Fee already paid. The Minimum Monthly Royalty Fee may be adjusted annually as set forth in Section 12 below.

**7.2    Century 21 Incentive Bonus Program Definitions.** In this Agreement, unless the context otherwise requires, the following terms shall have the following respective meanings with respect to the CENTURY 21 Incentive Bonus Program:

**7.2.1** "CENTURY 21 Incentive Bonus" (or "CIB") - means the cash award to be paid by us to the CENTURY 21 Firm. The CIB shall be based on the combined Annual Gross Revenue of the CENTURY 21 Firm; shall be consistent with the provisions hereof; and shall be payable no later than April 15, of the Calendar Year following the Calendar Year in which the combined Annual Gross Revenue was earned. Calculation of the CIB by us shall be made pursuant to the provisions of the following Table which may be amended from time to time.

### INCENTIVE BONUS PROGRAM FOR CALENDAR YEAR 2005

| NUMBER OF QUALIFIED OFFICES IN THE FIRM | 1% OF GROSS REVENUES IN EXCESS OF: | PLUS 1% OF GROSS REVENUES IN EXCESS OF: | PLUS 1% OF GROSS REVENUES IN EXCESS OF: | PLUS 1% OF GROSS REVENUES IN EXCESS OF: |
|---|---|---|---|---|
| 1 | $1,400,513 | $2,216,265 | $3,322,317 | $4,430,449 |
| 2 | $2,064,352 | $2,950,858 | $4,209,863 | $5,315,915 |
| 3 | $2,726,110 | $3,691,694 | $5,095,329 | $6,203,461 |





| NUMBER OF QUALIFIED OFFICES IN THE FIRM | 1% OF GROSS REVENUES IN EXCESS OF: | PLUS 1% OF GROSS REVENUES IN EXCESS OF: | PLUS 1% OF GROSS REVENUES IN EXCESS OF: | PLUS 1% OF GROSS REVENUES IN EXCESS OF: |
|---|---|---|---|---|
| 4 | $3,384,747 | $4,430,449 | $5,980,794 | $7,088,927 |
| 5 | $4,049,626 | $5,169,204 | $6,866,260 | $7,976,473 |
| 6 | $4,710,344 | $5,907,959 | $7,753,806 | $8,860,898 |
| 7 | $5,367,940 | $6,645,674 | $8,640,312 | $9,749,485 |
| 8 | $6,031,779 | $7,383,388 | $9,525,778 | $10,632,870 |
| 9 | $6,692,496 | $8,125,265 | $10,414,365 | $11,521,457 |
| 10 | $7,353,214 | $8,860,898 | $11,299,830 | $12,405,882 |
| 11 | $8,014,972 | $9,599,653 | $12,183,215 | $13,293,428 |
| 12 | $8,677,770 | $10,339,449 | $13,072,842 | $14,178,894 |
| 13 | $9,339,528 | $11,077,163 | $13,957,267 | $15,065,400 |
| 14 | $10,000,246 | $11,816,959 | $14,845,854 | $15,952,946 |
| 15 | $10,662,004 | $12,555,714 | $15,731,320 | $16,841,533 |
| 16 | $11,323,762 | $13,293,428 | $16,617,826 | $17,726,999 |
| 17 | $11,984,479 | $14,033,224 | $17,503,291 | $18,612,464 |
| 18 | $12,644,156 | $14,770,938 | $18,387,716 | $19,497,930 |
| 19 | $13,307,995 | $15,509,693 | $19,277,344 | $20,385,476 |
| 20 | $13,967,672 | $16,247,408 | $20,162,809 | $21,270,942 |

In no event shall the aggregate annual CIB payable to you as calculated in accordance with the Table exceed 2% of your Gross Revenue for such period.

7.2.2 "Annual Gross Revenue" - means the combined total of Gross Revenue, as defined in this Section 7 earned by each franchised office in a CENTURY 21 Firm for a particular Calendar Year, on which the CENTURY 21 Firm has actually paid Royalty Fees to us in a timely manner. Annual Gross Revenue shall not include any CIB award paid to you in any given year.

7.2.3 "Calendar Year" - means the one-year period beginning on January 1, of a given year, and ending on December 31, of that same given year.

7.2.4 "A CENTURY 21 Firm" - means one or more CENTURY 21 franchisees meeting the following criteria.

In the case of multiple franchised offices:

7.2.4.1 All franchise offices within the CENTURY 21 Firm shall be owned by a single individual, partnership or corporation; or,

7.2.4.2 Notwithstanding anything else in this Agreement to the contrary, we agree that for purposes of this Section 7.2, Annual Gross Revenue shall be deemed to include Gross Revenue for all offices operating under a franchise agreement in the same metropolitan area which have the identical ultimate equity ownership; provided that only one CIB Award shall be payable with respect to all of such offices.



**7.2.5**     "A Qualified CENTURY 21 Firm" - means a CENTURY 21 Firm that is eligible to receive a CIB pursuant to the requirements set forth in this Agreement and as may be amended from time to time, and has otherwise complied with all of the provisions of this Agreement.

**7.3     Determination of CIB Payment.** Any CIB to which a CENTURY 21 Firm is entitled shall be determined in accordance with the above Table, which Table shall be adjusted annually. All of the conditions to our obligation to pay the CIB and all adjustments to the CIB shall be set forth in the P&P Manual. We annually may increase or decrease the percentages and/or dollar amounts set forth in the above table provided that such adjustments may not exceed 20% of the percentages and/or dollar amounts then in effect. If a CENTURY 21 Firm consists of more than one franchise, the combined Annual Gross Revenue of all franchise members of that CENTURY 21 Firm shall be used in determining the amount of CIB due, provided however, in no event shall the aggregate annual CIB payable to you calculated in accordance with the Table exceed 2% of your Annual Gross Revenue for such year.

**7.4     Determination of the Number of Offices in a CENTURY 21 Firm Solely for the Purpose of CIB Calculations.** Any franchise that has been a member of the System for a period in excess of 24 months, as measured by the Effective Date set forth in its Agreement, shall be counted as a member of a CENTURY 21 Firm for the purpose of calculating the CIB, if it otherwise meets the criteria set forth in Section 7.2.4. On written notice to us, you may voluntarily elect, prior to the expiration of said 24 month period, to add a franchise to the total number of offices within a CENTURY 21 Firm for the purpose of calculating the CIB, if that additional office meets the criteria set forth in Section 7.2.4. You must elect to add such CENTURY 21 franchise on or before September 30th of the applicable year. Once you elect to add such CENTURY 21 franchise, you may not remove it from the total number of offices for the purpose of calculating the CIB. For the purpose of calculating the CIB, neither an Information Center franchise, a Seasonal Office, a Satellite Office, an Annex Office nor a Temporary Tract Office, (referred to collectively as "non-CIB qualifying offices") in a CENTURY 21 Firm with one or more other franchises shall be initially counted as a member of the CENTURY 21 Firm; however, the Annual Gross Revenue, if any, for such non-CIB qualifying offices shall be combined with the Firm's Gross Revenue when calculating the CIB.

**7.5     Conditions Precedent to the Payment of the CIB.** We may establish reasonable conditions to our obligation to pay a CIB, including such conditions as may be set forth in the P&P Manual and the following additional conditions, without limitation:

**7.5.1**     You and your Owners and Related Parties shall be current with respect to all financial obligations to us and shall otherwise be in full compliance with this Agreement, the P&P Manual, and all other agreements with us and/or any of our Related Parties;

**7.5.2**     You shall achieve minimum levels of participation and performance in our various sponsored programs during the entire Calculation Year; and

**7.5.3**     You shall have at least 15 months left prior to the expiration of this Agreement.

If any member of a CENTURY 21 Firm has not, on the date a CIB would otherwise be payable, satisfied all of the provisions of this Section 7.5, neither you nor any other member of the CENTURY 21 Firm of which it is a part shall have any entitlement to a CIB, and all rights shall be deemed forfeited.

**7.6     Continuing Obligation.** Notwithstanding any of the Agreement's provisions and the fact that the CIB will reduce our Royalty Fee revenue, you shall pay us the full amount of Royalty Fees specified in, and in accordance with, the provisions of this Section 7.



**7.7     Construction and Disputes.** We reserve the right to construe and interpret the CIB Program and, in the event of a dispute with regard to the payment of a CIB or interpretation of the CIB Program, our decision shall be final and binding on the parties.

**7.8     Right of Offset.** We shall have the right to offset any CIB Award earned by you against any and all payments, obligations, amounts, whether or not liquidated, that you or any of your Owners or Related Parties may owe to us or any of our Related Parties or affiliates.

## 8.0     NATIONAL ADVERTISING FUND CONTRIBUTION:

**8.1     NAF Contribution.** Commencing with the first full calendar month following the Effective Date or on the effective date of any assignment, as the case may be, you agree to pay in cash to us at our principal office, or at such other place as we may designate, in addition to the "Royalty Fee," a NAF contribution equal to 2% of your Gross Revenue, as described in Section 3.1.7; provided, however, that your NAF contribution shall be subject to the provisions contained in this Section 8.

**8.2     Minimum Monthly Contribution.** Your per Office contribution shall be subject to minimum and maximum amount limitations. Your initial minimum and maximum monthly contribution amount limitations currently are $562 and $1,300, respectively (as of June 1, 2005). You understand that the minimum and maximum monthly NAF contribution levels may be increased on multiple occasions.

**8.3     Payments.** NAF contributions shall be paid for each month by the 10th of the following month. Any NAF contributions not received by the 10th day of the month when they are due shall be considered past due.

### 8.4     Use and Management of NAF.

**8.4.1     **The NAF is not held in trust and we do not manage it in a fiduciary capacity. We may deposit NAF contributions with our other monies, but will separately and distinctly identify and account for NAF contributions on our books and records. We, in our sole discretion, will manage and use the NAF contributions for the development, implementation, production, placement, payment and costs of NAF advertising and marketing and other related services and programs. The NAF may also be used for other purposes such as training, customer service support, capital improvement incentives for franchised offices, and software development and distribution. As used in this Agreement, "NAF advertising and marketing" means national and regional advertising, marketing, promotions, public relations and/or other programs, including direct mail, market research, customer surveys and test marketing to promote and further the recognition of the Marks, the System and franchisees generally. "Regional" includes any marketing area as defined by us in which you and other franchisees carry on any Business. We shall be entitled to reimburse ourselves, our affiliates and other related parties from the Fund for expenses incurred or advanced to administer and manage the Fund for the conduct of the Fund's activities and for products or services provided to the Fund, including, but not limited to, the reasonable costs of accounting, collection and legal services, as well as other products or services which historically have been provided by unaffiliated third parties, and the costs for employees administering, managing and providing services to the Fund.

**8.4.2     **You understand that the NAF contributions are used for NAF advertising and marketing as well as other services and programs as set forth in the preceding paragraph, and that we are under no obligation to use or allocate NAF contributions on a proportional basis with the NAF contributions collected from any specific geographic area or to benefit any particular member or group of franchisees. We are not obligated to use all the NAF contributions in the year we receive them. If we spend less NAF contributions in any year than the amount of NAF contributions paid into the



fund in that year, such excess of NAF contributions will be accumulated for use in future years. The NAF may borrow from us or other lenders to cover deficits of the NAF.

**8.4.3**    Upon your written request, we will provide you with a financial report of the NAF showing the total NAF contributions collected and disbursed for the previous year, certified to be true and correct by one of our authorized officers or audited by an independent certified public accountant. We are not obligated to cause the NAF to be audited or reviewed by an independent certified public accounting firm.

**8.4.4**    Except as expressly provided in this Section 8, we assume no direct or indirect liability or obligation to you with respect to the maintenance, direction or administration of the Advertising Fund.

**8.4.5**    We will not be liable for any act or omission with respect to the NAF that is consistent with this Agreement or done in good faith.

**8.4.6**    We have the right to modify from time to time the method by which the required NAF contribution shall be computed and to require the payment of either a fixed monthly contribution amount (flat fee) or a monthly contribution amount equal to 2% of your Gross Revenue, pursuant to the above Sections 8.1, 8.2, 8.4.1, and 8.4.5. In the event that we shall require a fixed monthly contribution amount, said fixed monthly contribution shall first be established as that amount which is equal to the average monthly NAF contribution billed to all national franchisees in the calendar year immediately preceding the year in which the right to invoke the NAF contribution modification is exercised, plus the permissible annual adjustment in the NAF monthly contribution amount described in Section 8.2. Any fixed monthly contribution shall be adjusted annually according to Section 12; provided however, that in no case shall the NAF fixed monthly contribution required be less than $200. You will pay timely such fixed monthly contribution amounts, such that a contribution for a particular month is received by us at our principal office, or at such other location designated by us, not later than the last day of the following month, whether or not you actually receive a billing for such fixed contribution amount. You acknowledge that those provisions governing delinquent contributions and NAF contribution and expenditure guidelines, as currently are contained in Sections 8.3, 8.4.1, and 8.4.5, shall remain in effect in the event we elect to require a fixed monthly contribution amount pursuant to this Section 8.4.2. In the event we shall exercise the right granted it under this Section 8.4.2, we continue to retain those rights specifically reserved and described in the payment formula contained in Section 8.1. You acknowledge our right to modify the method of contribution pursuant to this Section 8.4.6 and recognize your continuing duty to fulfill all NAF obligations if and when such right is exercised.

## 9.0    TECHNOLOGY:

**9.1**    **Internet Reporting System.** We have developed an Internet based reporting system, consisting of our proprietary software and non-proprietary operating programs, that enables you to transmit required listing information, transaction information and other data, which you must use. We will provide the software to you without charge during the term of this Agreement. However, you must obtain appropriate connectivity and browser software for this application as well as any platform upgrades that may be necessary. You are responsible for purchasing compatible hardware from a vendor you select. The technology systems are not available for Apple®, Power PCs® or MacIntosh® hardware and are not compatible with OS2®, Unix®, or Linux operating systems.

**9.2**    **Required Computer Equipment.** The current minimum standards are listed below. You must also maintain high-speed access or a direct telephone line for this computer equipment. You acknowledge that

 

changes in technology may necessitate upgrading, replacing or adding to such equipment or purchasing or leasing additional equipment during the term of this Agreement.

> Minimum Hardware Requirements: Intel Pentium CPU in an IBM-compatible personal computer; 700 MHz speed; 20 gigabyte hard disk drive with 250 MB free space; 256 MB RAM (Random Access Memory) with 2 MB video card memory; Hayes-compatible 56K BPS modem[1]; 15 inch SVGA monitor (800 x 600 or higher resolution with 256 colors; 1024 x 768 resolution recommended); Inkjet printer or equivalent; 16 MB tape or second disk drive (mirrored) for back-up; Windows 98/Windows 98 Second Edition/Windows Millennium Edition (Windows ME)/ Windows 2000/Windows XP; Internet access using Internet Explorer 5.5 or above (6.0 recommended).

**9.3    Access Fee.**  You are required to transmit and access certain information, including Affiliate Transaction Reports, through the Internet based reporting system or through such other means as we may require.  We may charge an access fee (the "Access Fee") for certain uses of our technology products, including on-line retrieval of listings from our National Listing Bank.  We may also charge you a fee when we key in your listing information.  Any such fee shall be consistent with the fee imposed on other franchisees for similar services.

**9.4    Systems Support.**  Applications developed by us are licensed and distributed on an "as is' basis. We will use our best efforts to provide support, limited solely to our issued applications. We reserve the right to change the level and type of support provided at any time without notice.

**9.5    Your Responsibilities.**  You are responsible for the selection, purchase, installation and support of all hardware and systems software required to run our technology products.  We recommend you make arrangements with a local personal computer consultant or dealer for installation and ongoing support of your computer hardware and software.

**10.0    MANAGEMENT AND GOODWILL:**

**10.1    Management.**  You acknowledge that it is a material consideration to us in granting this Franchise, and it is your stated intent, that this Franchise is granted to a sole proprietor, a partnership, a limited liability company, or a corporation, as the case may be, on the basis that you and your Affiliates whose names are designated in Section 1 of this Agreement, shall actively participate in the management and/or supervision of the Business, as follows:

**10.1.1**  If you operate as a sole proprietorship, the proprietor agrees to engage in the management and/or supervision of the Business; or

**10.1.2**  If you operate as a partnership (general or limited), you agree that at all times during the term of this Agreement partners owning at least a majority interest in the capital and/or profits of the partnership shall engage in the management and/or supervision of the Business.  Additionally, you shall designate one of the partners or another party as the "Responsible Broker," approved in writing by us, and who shall be responsible for supervising the affairs of the Business and for assuring compliance by you and all your Affiliates with all terms of this Agreement; or

---

[1] The reporting system performs best when a high speed Internet connection is used.  Consult your local Internet service provider to find out more about obtaining the fastest possible Internet connection for maximum system performance.

  

**10.1.3**  If you operate as a corporation or a limited liability company, you agree that at all times during the term of this Agreement that each officer and director of the corporation and one or more shareholders or members who own in the aggregate at least a majority of the outstanding stock/interest in the corporation or limited liability company, respectively, shall engage in the management and/or supervision of the Franchise operation. Additionally, you shall designate the "Responsible Broker," who shall be responsible for supervising the affairs of the Franchise operations and for assuring compliance by you and all your Affiliates with all terms of this Agreement; and

**10.1.4**  At Section 1 of this Agreement, you designate the names, positions with respect to you and the percent of ownership in the Franchise of your partners, officers, directors, and shareholders members, as the case may be. Any change in the relationship of such designated persons as to your management or any change in your ownership resulting directly or indirectly in the transfer of 25% or more of the ownership rights in capital assets and/or profits of a partnership franchise, in any class of stock of a corporate franchise, or any membership interest in a limited liability company, shall be first approved in writing by us, provided such change or transfer of ownership is in compliance with the provisions of Section 15 of this Agreement. Furthermore, you agree that you will incorporate in your organizational documents (Partnership Agreement, Articles of Incorporation, or Operating Agreements, as the case may be) provisions that are expressly designed to carry out the provisions of this Section and, upon request, shall provide us with evidence of compliance with this provision.

**10.2**  **P&P Manual.**  You agree to abide by the terms of the P&P Manual and to supervise your sales associates, employees, and Affiliates to assure their compliance with the P&P Manual. You acknowledge that we have reserved the right to make reasonable changes in the P&P Manual that we determine are important for the continued success and development of the System and its members. Accordingly, you agree that from time to time we may reasonably change or modify the Marks and the System as well as the standards and specifications set forth in the P&P Manual, including, but not limited to, the modification or adoption of new or modified trade names, trademarks, service marks, sign and logo requirements, or copyrighted materials. You also agree, at your own expense, to adopt on a timely basis (but in no case later than 90 days after notice) any such modifications as if they were a part of the System at the time of the execution of this Agreement. We shall notify you by email or regular mail as to changes in the P&P Manual or other changes in the operational structure of the Franchise.

**10.3**  **Ethical Conduct, Consumer Relations and Protection of Goodwill.**  You will uphold and take reasonable efforts to ensure that your sales associates and employees uphold high standards of honesty, integrity, fair dealing and ethical conduct in dealing with the general public, the customers of the Business, other members and with us. All persons engaged in the Business will comply with the Code of Ethics of the National Association of REALTORS®. You hereby authorize any federal, local or state body regulating or supervising real estate broker practices to release to us information related to complaints and to any disciplinary actions taken based upon your practices or the practices of your affiliates. You also agree to maintain all permits, certificates and licenses (necessary for your operation) in good standing and in accordance with applicable laws and regulations. You further agree to operate the Business in compliance with all applicable municipal, county, state and federal laws. The parties recognize that from time to time disputes may arise between you, or your Affiliates or agents, and a client, customer or other individual or entity involved in a real estate related transaction, and that it is in the best interest of all parties, when possible, to quickly resolve such disputes. Accordingly, you agree to promptly respond to all complaints received from your customers or clients or other individuals, in an attempt to resolve said dispute in a reasonable business manner. In the event that we: (i) are contacted by a complaining party or become aware of a complaint regarding a particular transaction in which you were involved; and, (ii) make a reasonable determination pursuant to this Section that you, or your agents or Affiliates, have acted in a materially improper fashion in said transaction; and, (iii) determine that the complaint has not been resolved with the complaining party to our satisfaction within a period of 30 days from our determination that you acted in a

 

materially improper fashion, then we may, at our option, terminate this Agreement at any time upon 10 days written notice to you.

## 11.0   OTHER COSTS AND OBLIGATIONS OF FRANCHISEE

**11.1   Marketing Materials.** We will make materials available for you to purchase to promote your Business and our products, services, and programs. You will pay for such purchases by cash, check, money order or credit cards separately from payment of fees under Sections 7 and 8.

**11.2   Payments and Interest.** You shall pay promptly to us all fees and contributions due hereunder, as well as any additional fees or charges incurred for any products, supplies, or services furnished or to be furnished by us at your request. All payments shall be in United States Dollars. Notwithstanding any designation by you, we shall have sole discretion to apply any payments made by you or on your behalf, (and to apply any amounts owed to you or any of your Related Parties by us or any of our Related Parties) to any of your past due indebtedness for Royalty Fees, NAF contributions, purchases from us or any of our Related Parties, interest or any other indebtedness of yours or any of your Related Parties to us or any of our Related Parties. No restrictive endorsement on any check or in any letter or other communications accompanying any payment shall bind us or any of our Related Parties. Our acceptance of any such payment shall not constitute an accord or satisfaction. Our and any of our Related Parties' acceptance of any payments made by you shall not be construed to be a waiver of any breach or default of any provision of this Agreement. Any payments which are more than 10 days past due shall bear interest at the lower rate of either the highest rate allowed by law or 18% per annum simple interest (1.5% per month). You may not withhold payment of any Royalty Fee, NAF contribution or any other amount due to us or our affiliates on the grounds of the alleged non-performance or breach of any of our or our affiliates' obligations under this Agreement or any related agreement, including agreements for the sale or products or services by us or our affiliates to you.

**11.3   Electronic Bill Payment.** Currently the recommended form of payment is through CREST epay. The current acceptable forms of payment are either electronically or by check. Credit card payment is not acceptable. The recommended form of payment and the acceptable forms of payment may be revised from time to time as provided in the P&P Manual.

**11.4   Offsets.** We may offset any amounts we owe you in full or partial satisfaction of any amounts you owe under this Agreement, or any other agreements between you and us or any of our Related Parties, whenever you are more than 30 days past due.

**11.5   Costs of Collection.** Where permitted by law, you will pay all costs and expenses, including reasonable attorneys' fees, that we incur in the collection of any fees or amounts due from you under this Agreement or otherwise, or any of our related Parties, to enforce the provisions of this Agreement.

**11.6   Returned Checks.** We will charge you a returned check charge on any checks submitted to pay any fee or other amount owed to us returned unpaid for any reason. You must replace any such check with a certified or cashiers check, money order or electronic transfer of funds within 3 days after notification. We may charge the highest commercial rate permissible under the law.

**11.7   Net Worth.** You acknowledge that a material consideration of us in granting this Franchise is the representation by you that you are financially responsible and have a net worth in tangible assets in excess of $75,000 not including the value of your interest in this Agreement or your principal residence. You agree and warrant that at all times throughout the term of this Agreement, you shall maintain a minimum net worth as represented herein. If your net worth falls below the specified amount, you shall be required to procure a

  

guarantor acceptable to us to the extent of the deficiency, which guarantor shall not only guarantee your performance under this Agreement, but also your duties to your clients and to the public.

**11.8     Listing and Pending Listing Inventory.**  You agree to supply to us, no later than 15 days after the Acceptance Date, and at all times to maintain with us, a complete and current inventory of all listings, pending or otherwise, of your Business, in our required format, transmitted in our required manner, for us to transmit to our other franchisees or brokers designated by us when appropriate.  You consent to our use of your listing and transaction information.  With respect to pictures or other media you supply to us (including those intended for use in listings on our Web site), to the extent the copyright of any such picture or other media is owned by you, you grant us a fully paid up and royalty free license and right to use and sublicense such pictures and other media for any purpose we deem appropriate, and to the extent you do not own the copyright in such pictures or other media, you agree to indemnify and hold us harmless against any claims by third parties that our use infringes upon such third party's rights.

**11.9     Obligations Related to Quality of Service and Goodwill:**  In addition to your other obligations contained in this Agreement, you acknowledge that it is of utmost importance that the services provided by you to the consuming public adhere to the minimum standards associated with the System and serve to enhance the reputation and goodwill associated with the Mark.  You agree that the requirements set forth in this Section are necessary to assure continuing public acceptance and patronage of the System and to avoid deterioration or obsolescence in the operation of your Office.  You, therefore, agree to undertake and carry out diligently all the following obligations:

**11.9.1   Review of Advertising.**  You acknowledge that we have the exclusive right to use and sublicense the Marks in the United States and throughout the world and that the System is our sole and exclusive property in the United States and throughout the world, and that any advertising or promotional materials produced by you will reflect and have an impact upon the System.  Accordingly, you agree to submit, upon our written request, all advertising or promotional material produced by you to us at least five days prior to the planned publication or airing thereof.  We shall approve or disapprove the use of the Marks in said advertising, which approval shall not be unreasonably withheld.  All of your advertising will be completely factual, not intentionally misleading and in good taste in our judgment.

**11.9.2   Quality Survey.**  Upon the closing (settlement) of each transaction which you have handled for either a buyer or seller (hereinafter collectively referred to as "client"), and subsequent receipt by us of a Commission Disbursement Authorization (CDA) or Sales Report (SR), which CDA or SR shall confirm that the buyer or seller consents in writing for our subsequent e-mail contact, regarding that transaction, we may, and you so authorize us to, send to your client (or a sampling of your clients) in said transaction a questionnaire which will request the client to rate your service and performance and your sales associates in said transaction.  The procedures and standards of quality and performance of this rating system, or any other rating system that we choose to implement in addition to or in substitution of such questionnaire rating system, shall be set forth in the P&P Manual, as it may be revised and/or supplemented from time to time by us.  In establishing any such standards, we shall exercise reasonable business judgment in a good faith attempt to maintain and improve the quality of service provided under the service mark, CENTURY 21.

**11.9.3   Standards.**  In the event that your standards during any measurement period established from time to time by us do not meet the then-current minimum Standards, you may be placed on probation for a period to be established by us.  If deficiencies identified by us in the quality of your service and performance are not corrected within said probationary period, as evidenced by returned client questionnaires received during the probationary period or such other measure as we may adopt or

  

rely upon from time to time, then we may, at our option, terminate this Agreement at any time upon 10 days written notice to you, unless a greater period is required by law.

## 12.0    FEE INCREASES:

**12.1    Annual Increases.** Effective June 1 each year during the term of this Agreement, we may, at our sole option, increase the Minimum Monthly Royalty Fee under Section 7.1.4 of this Agreement, the minimum and maximum NAF contributions under Section 8.2, and the CIB figures set forth in the table under Section 7.2.1, of this Agreement. No percentage increase in fee will exceed the greater of (i) the percentage increase of the Consumer Price Index for all Urban Consumers, U.S. City Average (1967=100) ("CPI") during the period between November of the applicable base year of such particular fee and the November immediately preceding the June 1 on which such fee increase is to take effect plus 3%, (ii) the yield to maturity on United States Treasury Bonds (as listed in The Wall Street Journal or such other source as we deem reliable) maturing approximately 10 years after November 1st in the year preceding the effective date of such change plus 3%, or (iii) the US Average Existing Single Family Home Sales annual increase, not seasonally adjusted, yearly percent change, as quoted in the July National Association of Realtors® Press release or any other nationally recognized source of housing price data, at our discretion, plus 3%. We may round to the nearest dollar the amount of increase resulting from application of the CPI percentage, the Treasury Bond yield, or the housing price percentage. The applicable base year for each particular fee is defined for CPI purposes as the calendar year immediately preceding the later of the date we first set the fee or the June 1 on which we last raised the fee pursuant to this option. As of the Effective Date of this Agreement, the base year for all annual increases is 2003. An increase in any particular fee (for example, minimum monthly NAF contribution) does not change the applicable base year for any other particular fee not increased at that time.

**12.2    Other Fee Increases.** We will also have the right, at our sole option, to impose, eliminate or modify initial franchise fees, training fees, fees to participate in voluntary programs at any time, including, but not limited to, referral fees, late charges, returned check charges and access fees, which revisions will not be subject to the limitations described in Section 12.1.

## 13.0   RECORDKEEPING; AUDIT:

**13.1    Recordkeeping, Financial Statements and Audit.** You will maintain accurate records in the form prescribed by us during the term of this Agreement and for three years after the expiration or termination of this Agreement. You will provide us with an annual balance sheet and profit and loss statement within 60 days after the end of each calendar year. You shall also supply to us a complete financial statement, on an annual basis within 90 days of your fiscal year end and a copy of your federal tax return. You, your principal shareholder or member (if you are a corporation or a limited liability company), or a general partner (if you are a partnership) or your independent accountant shall sign said financial statement certifying the truth and accuracy of the matters contained therein. Financial statements must be prepared in accordance with generally accepted accounting principles. You must transmit information to us in the manner and format required by us and allow us or our designee(s) to audit your operations, including your financial record retention systems, or to obtain information from other sources including the local Multiple Listing Service, regarding your Gross Revenues, to verify the Royalty Fees, NAF contributions and any other fees then due under this Agreement during the applicable audit period, as well as any means necessary to calculate CIB Awards. You must immediately pay us any of such fees or contributions shown by the audit as having been due during the audit period but not paid. If the audit discloses a deficiency of at least 5% in amounts due under this Agreement for any three-month period, you must also pay all costs incurred by us with regard to the audit and such deficiency will constitute a material breach of this Agreement. You must also pay the costs of the audit if we must spend more than the average amount of time or energy to get your records in



order to do the audit, as compared to an office with a reasonably similar number of listings and transactions. We may charge you an administration fee, of up to $500 currently, if you cancel or reschedule an audit.

**13.2     Access to Records.** We, or people we may designate in writing, will have the right during the term of this Agreement and for period of three years following any termination of this Agreement, to visit your Office location or administrative office location (or such other place where your records may be located) during normal business hours and without hindrance or delay, proceed:

**13.2.1**     to inspect, audit, check and make copies of and extracts from your books, records (including state and federal tax returns), journals, orders, receipts, any correspondence and other data relating to your Business or to any transactions, including (i) the books and records of any affiliated entity whose funds are commingled with the Business, (ii) operated at the same location as the Office, or (iii) where the Marks were used in connection with the other business;

**13.2.2**     to make such verification concerning any portion of such records or of your Business as we may consider reasonable under the circumstances, including prompt response to any post-audit request for additional information and

**13.2.3**     to discuss your records and Business with any officers, directors and employees responsible for maintaining the records, or with your Responsible Broker, or with your sales associates with respect to their transactions.

**13.3     Condition of Assignment or Mutual Termination.** We may require an audit of your operations at any time, including as a condition of our approval of any assignment or mutual termination of this Agreement.

**13.4     Sales Associate Information.** You will provide us information about your sales associates and allow and assist us in any survey of your sales associates. Sales associate information shall be updated promptly; all sales associate information shall be current as of the end of each calendar quarter.

**13.5     Other Matters relating to Information.** No information supplied to us shall be considered confidential by the parties. We shall have the right to use information derived from that supplied by you for our own business purposes, to disclose such information as may be required by law and governmental authority, and to aggregate such information with other franchisee information and disclose such aggregated information as we deem appropriate. You will provide us and/or cooperate with us in collecting other information as we may reasonably request, including information for research and development of services, products and programs, identification of demographic information, industry reports and preparation of the our Uniform Franchise Offering Circular.

**13.6     Cooperation.** It is understood that you will have an affirmative obligation to cooperate in the scheduling of any requested audit and in providing access to the records.

**14.0     MODIFICATION OF THE SYSTEM; IMPROVEMENTS; CONFIDENTIALITY:**

**14.1     Agreement to Accept Modifications.** We may change, augment or modify the Marks or the System, including the adoption and use of new or modified trade names, trademarks, trade dress, service marks, copyrighted materials, new products or services, new equipment, new business methods or new techniques in our sole discretion from time to time, without the consent of the franchisees. You will accept, use and display any such changes in the System as if they were a part of this Agreement at the Acceptance Date. You will make such expenditures as may be required to conform to such changes, augmentations or modifications.

  

**14.2    Elimination of Programs.** Notwithstanding any other provision of this Agreement, we reserve the right to modify, suspend or eliminate any new or existing portion of the System or the Marks.

**14.3    Improvements by You.** If, during the term of this Agreement, you conceive or develop any improvements or additions to the System, new trade names, trademarks, service marks or other commercial symbols related to the Business or any advertising or promotion ideas related to the Business ("Improvements"), you will fully disclose the Improvements to us without disclosing the Improvements to others. You must obtain our written approval before using any of the Improvements. Any Improvements approved by us shall be deemed licensed to us on a royalty-free, paid-up, perpetual worldwide license, and may be used by us and our franchisees without any obligation to you for royalties or similar fees. You assign to us without charge, any and all of your right, title and interest in and to any and all Improvements, including the right to grant sublicenses to use any Improvements. We at our discretion may make application for and own copyrights, trade names, trademarks and service marks relating to any Improvements. We may also consider the Improvements as our property and trade secret. We will authorize you to utilize any Improvements authorized generally for use by other franchisees.

**15.0    ASSIGNMENT:**

**15.1    Assignment Generally.** You may not assign the rights, or delegate your duties under this Agreement without our advance written approval. We may withhold or condition our approval in our sole discretion. *The terms of any Addendum to this Agreement will not be assigned as part of any assignment unless we and the assignee execute a new Addendum containing those terms.* For purposes of this Agreement, a transaction or series of transactions resulting in the sale, transfer or other conveyance of a controlling interest in you as the Franchisee, if you are an entity and not an individual, including without limitation the sale of assets, issuance or sale of new or outstanding equity interests or presently exercisable options to purchase equity interests, merger, consolidation, termination, winding up, dissolution and reorganization will be deemed an assignment. If you are owned by an entity, an assignment will be deemed to occur if one of these events or transactions occurs that involves your Owner. If you request approval of an assignment, you will not be relieved of your contractual obligations to us for the remaining term of the Agreement, unless and until we approve the assignment. After an assignment of the Agreement occurs, you will remain liable for events which occurred before the assignment and for all obligations which would survive termination or expiration of this Agreement. Upon assignment, you will not be released from any vicarious liability or tort claims that arose before the assignment occurs. If you are a sole proprietorship or partnership, we expressly consent to the transfer or assignment of this Agreement, without payment of a transfer fee, to an entity formed, owned and controlled solely by you to operate the Business, provided that such transfer or assignment shall not relieve the original Franchisee of the obligations of this Agreement nor shall it affect in any manner any obligations to guarantee this Agreement; and further provided that there is no change in the Responsible Broker for the office, unless approved in writing by us, which approval shall not be unreasonably withheld. You agree to notify us in writing of such transfer or assignment of assets at least 10 days prior to such a transfer and shall supply us with such documents as we may request including, but not limited to, transfer or assignment forms, Articles of Incorporation and Bylaws, Articles of Organization, etc. Any proposed transaction involving less than a controlling interest in this Agreement, of you, or of 25% of the assets comprising the Business, shall be reported by you to us at least 20 days in advance but shall not be subject to our approval so long as there is to be no change in the Responsible Broker and the transaction in aggregate with other previous transactions does not effect a change in control or 25% of the assets of the Business. Furthermore, if you are owned by either a partnership or a corporation, or a limited liability company, which in turn is owned in whole or part by another limited partnership, corporation, or a limited liability company, this Section shall be construed to apply to these entities as well. It is the intention of the parties that any transfers of ownership in any entity ultimately owning part or all of the Franchise (directly or indirectly) shall be subject to the restrictions imposed by this Section.

  

**15.2    Right of First Refusal.** If you and/or any of your Owners desire to transfer the Franchise (as the phrase "Transfer the Franchise" is defined below), for valuable consideration, you and/or such Owner shall obtain a bona fide, signed, written offer from the potential purchaser and shall deliver immediately to us a complete and accurate copy of such offer. If the offeror proposes to buy any other tangible or intangible assets that do not relate to or are not used by or in the Business from you or any of your Owners or Related Parties (other than rights under other the Agreement), the proposal for such assets or rights must be set forth in a separate, contemporaneous offer that is disclosed to us, but to which this right of first refusal is not applicable. The price and terms of purchase offered to you or your Owner(s) in connection with a proposal to Transfer the Franchise shall reflect the bona fide offered price and not reflect any value for any other assets.

15.2.1    Within 30 days from the date of delivery of a complete and accurate copy of such offer to us, we or our assignee shall have the option exercisable by written notice delivered to you or your Owners, to purchase the interest which is the subject of the offer, for the price and on the terms and conditions contained in such offer; provided, however, that we may substitute cash for any form of in-kind payment proposed in such offer, our credit shall be deemed equal to the credit of any proposed purchaser, and we shall have not less than 90 days from the option exercise date to consummate the transaction. Terms and conditions for the purchase of the entire ownership interest shall be as similar to the terms and conditions set forth in the offer as practicable, except for the substitute provisions noted above in this subsection.

15.2.2    We shall be entitled to purchase such interest subject to all customary representations and warranties, closing documents, releases and indemnities as we reasonably may require, including representations and warranties as to the ownership and condition of, and title to, shares of ownership interests and/or assets, the validity and status of contracts and leases and the extent of liabilities, contingent or otherwise, of the entity whose interests are being purchased. Unless the same are expressly and specifically limited in the third party's offer, we also shall have the option to acquire from you, for nominal consideration, an assignment of all of your rights under any lease or sublease covering the Office premises.

15.2.3    If we do not exercise our option to purchase, you or your Owners may complete the sale to such offeror pursuant to and on the exact terms of such offer, subject to the approval of the transfer by us as provided in this Section 15; provided, however, that if the sale to such offeror is not completed within 90 days after delivery of such offer to us or if there is a material change in the terms of the offer, we shall have an additional option to purchase during the 30-day period following either the expiration of such 90-day period or your notification to us of a material change in the terms of the offer.

15.2.4    If the proposal to Transfer the Franchise is for no valuable consideration, such as a gift or testamentary transfer or a reorganization of your legal form of organization without any change in the individuals owning such organization, we may not exercise any right of first refusal under this Section 15; however, such a proposal to Transfer the Franchise may constitute an assignment subject to our approval as set forth in this Section 15.

15.2.5    The phrase "Transfer the Franchise" means the voluntary or involuntary, direct or indirect, sale, assignment, transfer, license, sublease, collateral or conditional assignment, inter-vivos transfer, testamentary disposition, pledge, encumbrance, creation of a security interest in, or any other disposition of this Agreement, any interest in or right under this Agreement, or any form of your ownership interest or your assets, revenues or income or the Business, including without limitation:

 

**15.2.5.1** Any sale, transfer, redemption or issuance of a legal or beneficial ownership interest in the equity interest in, or of any interest convertible to, or exchangeable for, an equity interest in Franchisee;

**15.2.5.2** Any merger or consolidation of Franchisee whether or not you are the surviving entity;

**15.2.5.3** Any transfer, out of the ordinary course of business, of any of the assets used in the Business, whether or not in conjunction with a transfer of your rights under this Agreement;

**15.2.5.4** Any transfer in, or as a result of, a divorce, insolvency, entity dissolution proceeding or otherwise by operation of law;

**15.2.5.5** Any transfer upon your death or any of your Owners by will, declaration of or transfer in trust, or under the laws of intestate succession; or

**15.2.5.6** Any foreclosure upon assets of the Business or the transfer, surrender or loss by you of possession, control or management of the Business.

**15.3    Death or Other Incapacity.** At our option, at any time more than: (i) nine months after your death, incapacity of or the appointment of a conservator or guardian for you or your estate if you are a sole proprietorship; or (ii) nine months after the death or incapacity of any of the general partners, or the appointment of a conservator or guardian for the person or estate of any of the general partners, if you are a partnership; or (iii) nine months after the death or incapacity of the Responsible Broker, or the appointment of a conservator or guardian for the person or estate of the Responsible Broker, if you are a corporation or limited liability company; provided, however, that this Agreement shall not terminate if within said nine months (a) this Agreement or the said individual's interest herein is assigned in accordance with the provisions of Agreement to a licensed real estate broker approved by us, or (b) if you are a partnership, limited liability company, or corporation, a licensed real estate broker approved by us shall become the Responsible Broker. "Incapacity" includes a determination of incompetence pursuant to judicial proceedings or suffering a debilitating physical illness that prevents continuance in the ownership and/or operation of the Business.

**15.4    Approval of Assignment; Prerequisites.** Before granting approval of any proposed assignment, we may investigate the business experience, character, reputation and financial responsibility of the proposed assignee to determine the proposed assignee's ability to perform under this or any subsequent membership agreement. Our approval of any assignment may be based upon various factors which may also include (i) our investigation of the business experience, character, reputation and financial responsibility of the proposed assignee; (ii) the proposed assignee's undertaking to operate in the same marketing area as the assigning Franchisee; (iii) the execution by the proposed assignee and its owners of a franchise agreement and of the guaranty in the forms then being marketed to our prospective franchisees for a ten-year term; (iv) payment to us of an assignment fee of $5,000 (which assignment fee will be in lieu of paying an initial franchise fee); (v) payment of all debts of the assignor and assignee to us, the NAF and the applicable local or regional Broker Council, if any; (vi) execution by the assignor of a release of all claims against us and our affiliates; (vii) an audit by us of your operations; and (viii) proof of purchase of tail coverage on your errors and omissions and general liability insurance policies that names us as an additional insured. Furthermore, we may examine the business experience, character, reputation and financial responsibility of the proposed assignee in light of the Gross Revenue and market share of your Business. The prospective assignee must meet our requirements for new franchisees that are in effect at the time of the proposed assignment. We may at our sole option deny approval of the assignment if the assignee lacks sufficient business experience, character, reputation or financial responsibility to maintain our identity and market share in your marketing area to the extent experienced before the assignment. Your assignment without our advance approval will constitute a material

  

breach of this Agreement and, at our sole option, the assignment or attempted assignment of all or any portion of your rights under this Agreement will be null and void, and you will remain liable for all obligations under this Agreement.

**15.5    Orientation Training for Assignee.** The assignee must attend the Orientation Training seminar for new franchisees in accordance with the provisions of Section 6.1.3. The assignment fee covers the costs of such implementation as described in Section 6 and integration of the assignee into the System.

**15.6    Assignment by us.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. You are not the third party beneficiary of any contract with a third party to provide services to you under this Agreement. We will have no obligations to you after you are notified that a transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**16.0    EXPIRATION AND TERMINATION:**

**16.1    Non-Renewability of Agreement.** The Term of this Agreement is set forth in Section 1.5 and, as is provided, certain of your duties and obligations shall survive the expiration or termination of this Agreement. The tender or acceptance of payment by you subsequent to the expiration or termination of this Agreement shall neither prejudice our rights to enforce the expiration or termination, or any expiration or termination obligations contained in this Agreement, nor create any additional rights in your favor under this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS.

**16.1.1    Transition.** In order to facilitate an orderly and efficient transition and to preserve the goodwill associated with the System and the Marks in the event of termination or expiration of this Agreement, you agree that we have the right to contact and communicate personally with any or all of your sales associates 180 days prior to the expiration of this Agreement or, in the case of termination, immediately after notice of termination has been delivered to you (including any period of time you may have to cure defaults) to solicit and/or discuss with them their options for continued affiliation with other CENTURY 21 offices.

**16.1.2    Holding Over.** If you continue to use the Marks after the expiration or termination of this Agreement, you will be deemed to be operating on a month-to-month basis under the terms and conditions of the then-current franchise agreement being offered to prospective franchisees, except that the Royalty Fee payable shall be 15% of Gross Revenue.

**16.2    Termination.** This Agreement may be terminated only under the following terms and conditions:

**16.2.1    Mutual Consent.** By mutual consent of the parties;

**16.2.2    Termination by You. Death or Disability of Majority Owner.** By you, in the event a "Majority Owner" (as defined below) dies, is determined to be incompetent pursuant to judicial proceedings or suffers a debilitating physical illness which prevents said Majority Owner from continuing in the ownership and operation of the Business, upon delivery to us of 90 days prior written notice of your decision to terminate and upon delivery to us of a written agreement by you and each of your remaining Principals confirming that each of them will not act as or affiliate with (as an owner, broker or sales associate) any real estate brokerage franchise system or independent real estate brokerage organization within a 20 mile radius of the Office for a period of 3 years following the effective date of early termination of this Agreement. For the purposes of this paragraph, Majority Owner is defined as the following natural persons: (i) in a sole proprietorship, the proprietor; (ii) in a corporation, any shareholder who owns greater than 50% of the outstanding equity securities of the





corporation; (iii) in a limited liability company ("LLC") or limited liability partnership ("LLP"), anyone who holds a greater than 50% interest in the LLC or LLP; or (iv) in a partnership, anyone who owns greater than 50% of the capital or the profits of the partnership. A "Principal" is defined as the following individuals: (i) in a sole proprietorship, the proprietor; (ii) in a corporation, the president, chief executive officer, chief operating officer, any officer who holds the real estate license for the corporation and any shareholder who owns at least 25% of the shares of the corporation; (iii) in a limited liability company, the manager, managing officer and any member who holds at least 25% interest in the limited liability company; or (iv) in a partnership, any general partner or any member who owns at least 25% of the capital or profits of the partnership. Notwithstanding the foregoing language, any Owner with an ownership interest of 10% or less shall not be subject to the restrictions set forth in this Section 16.2.2.2.

**16.2.3  Termination by us for Good Cause.** By us for good cause which will mean any material breach by you of your obligations under this Agreement as determined by us in our sole discretion exercised in good faith. Good cause includes both curable and non-curable defaults, including those listed at Sections 16.2.4 and 16.2.5, below, and failure to meet the Minimum Office Design and Appearance Standards or Minimum Operating Standards, as set forth in Sections 16.2.6 and 16.2.7, respectively, below.

**16.2.4  Curable Defaults; Notice.** After giving you 30 days' advance written notice of the proposed termination and the opportunity to cure the breach during the entire notice period, or such longer or shorter notice as is required or permitted by the law of the state where the Office is located, if the breach is:

**16.2.4.1** The failure to pay when due any financial obligation to us, to the applicable Broker Council, or to the NAF;

**16.2.4.2** Refusal or failure to join and/or participate in any applicable Broker Council or to comply with or abide by the authorized and lawful actions and decisions of that Broker Council;

**16.2.4.3** An audit by us of your records which discloses a deficiency of at least 5% in amounts due under this Agreement within any three month period, or your refusal to permit us to audit your operations and records, or your failure to reasonably cooperate with our audit of your operations and records;

**16.2.4.4** Upon death, judicial determination of incompetence, or the appointment of a conservator or guardian over your person or estate of a Principal as defined in Section 16.2.2.2, the failure to seek written approval from us for assignment within 180 days after such event; such approval will not be necessary if the Business will be conducted by a survivor or heir engaged in the Business or employed by you in the Business before the event;

**16.2.4.5** Any attempt by you to subfranchise (Subfranchising is defined to include, without limitation, any license or grant to any other person or entity of the right to use the Marks or the System licensed to you under this Agreement for the operation of an office owned or leased, in whole or in part, by such other person or entity, or in which such other person or entity is responsible for losses, if any, incurred in the operation of such office);

**16.2.4.6** The actual or attempted cancellation, renouncement or alteration by any parties who have given personal guarantees of your payment and performance under this Agreement, unless we have given advance written consent or you have procured a replacement guarantor satisfactory to us;

 

**16.2.4.7** If you do not open your approved Office on the Effective Date; or

**16.2.4.8** If we obtain a judgment against you that is not fully satisfied within six months from the date the judgment was issued by the Court, and from which no appeal was taken;

**16.2.4.9** Your failure to comply with all applicable municipal, county, state or federal laws;

**16.2.4.10** An unauthorized change in ownership or the transfer of ownership of the franchise without our written permission;

**16.2.4.11** The operation of any other business within the franchise location in connection with the use of our Marks;

**16.2.4.12** The operation of any Ancillary Services without our prior written consent;

**16.2.4.13** Your failure to properly display and use our Marks as described in the Identity Standards set forth in the Policy and Procedure Manual; or

**16.2.4.14** Any other material breach of this Agreement not listed below as a noncurable default.

Upon receipt of notice to terminate with right to cure, you must immediately commence diligently to cure that breach. If you cure that breach during such period, our right to terminate this Agreement for such breach will cease, subject to termination for repeating the same default as described below.

**16.2.5   Noncurable Defaults; No Notice Required.** We reserve the right to terminate this Agreement immediately without prior notice and without your right to cure for any of the following causes:

**16.2.5.1** Suspension or revocation of your responsible broker's license;

**16.2.5.2** Any conduct by you which impairs the image, identity, value or goodwill associated with the Marks or the System;

**16.2.5.3** You are the subject of any bankruptcy, receivership, composition, assignment, marshaling, insolvency or similar proceeding for the benefit of creditors, provided that termination upon bankruptcy may not be enforceable under Title 11, United States Code;

**16.2.5.4** Abandonment of your Office(s), demonstrated by removal of the Marks or by your not operating the Business for five consecutive business days or any shorter period when, under the facts and circumstances, it would not be unreasonable for us to conclude that you do not intend to continue to operate the Business, unless the cause is a force majeure beyond your control, e.g., flood, earthquake or similar acts of God;

**16.2.5.5** Any default for which we have issued you a notice of default during the last 12 months advising you of our intent to terminate for the same cause, even if the default(s) were cured; or

**16.2.5.6** Any material misrepresentation or omission by you to us in the franchise application or otherwise with respect to acquiring the Franchise.

**16.2.6   Failure to Meet Minimum Office Design and Appearance Standards.** You acknowledge and recognize that all Offices must meet certain minimum standards of professionalism as regards Office



size, interior design and decor, exterior attractiveness, general appearance and cleanliness. These standards are set forth in the P&P Manual. In the event that your Office fails to meet these Minimum Office Design and Appearance Standards, we will notify you in writing, describing the deficiencies, and you will be given an opportunity of 90 days to correct them. If such deficiencies are not corrected to our satisfaction within such period, we may, at our option, terminate this Agreement.

**16.2.7    Minimum Operating Standards.**  In the event your performance falls below the minimum operating standards set forth in this Section 16.2.7, you will be notified in writing setting forth such deficiency and at the our option, you may be placed on probation for a period of not less than three months nor more than six months.  If such deficiency is not corrected within said probationary period, we may, at our option, terminate this Agreement. The minimum operating standard requires that you shall, in every six month period, beginning with a starting point established by us, maintain a volume of closed business on which Royalty Fees have been paid sufficient to produce revenue (for purposes of determining Royalty Fees) over such period equal to not less than 50% of the average Gross Revenue (for purposes of determining Royalty Fees) generated by all franchisees over such six month period in the same local council or in such other geographic area as we may reasonably establish from time to time.

**16.3    Our Pre-Termination Options.**  Before termination, if you fail to pay any amount owed under this Agreement, or fail to comply with any term of this Agreement, then in addition to any right we may have to terminate this Agreement or to bring a claim for damages, we will also have the following options:

**16.3.1**    To suspend all services provided to you under this Agreement or otherwise, including training, marketing assistance, CIB and other award(s) eligibility for you and your agents, and the sale of products and supplies;

**16.3.2**    To suspend taking or placing referrals or relocation requests, for or from you and to direct any inquiries regarding these or other programs or services to other franchisees; and/or

**16.3.3**    To eliminate listing you in any advertising, marketing or promotional materials, including any directory listings, approved or published by us.

We may continue taking such actions until you have brought your account current, cured any default, and complied with our requirements, and we have acknowledged such compliance in writing. Our exercising one or more of the options permitted in this Section 16.3 will not suspend or release you from any obligation you would otherwise owe to us, the applicable Broker Council or to the NAF. Your right to cure does not restrict our right to initiate or institute any legal action it deems appropriate before, during or after the cure period.

**16.4    Effect of Expiration or Termination.**  In the event of expiration or termination, you must immediately, at your expense, return to us all of our property including originals and all copies of the P&P Manual, all copies of our technology products (including copies held or under the control of your sales associates), and all films, cassettes and instruction manuals which are part of our programs. You must also immediately discontinue all use of the Marks licensed to you by this Agreement in any and all of your materials. You must immediately discontinue all use of signs or cross arm signposts displaying our unique style, logo, colors, color patterns and designs and/or Marks.  If you desire to use such signs or cross arm signposts after the expiration or termination, you must immediately change the colors and color patterns by complete repainting of the signs or signposts and you must immediately remove or cover any Marks on the signs and must provide us with color photographs of such changed signs and signposts.  Effective immediately upon the date of termination or expiration, you will refrain from any representation whatsoever that you are our franchisee or are or have been otherwise affiliated with us, and take any affirmative action necessary to remove any use of the Marks in connection with your business. You must de-identify yourself

  

from the System in a manner that does not confuse the public about the fact that you are no longer a part of the System. You must immediately advise all of your then-current real estate listings that you are no longer associated with us and must assign your telephone number to us or our designee(s) and immediately cause the local phone company (white pages) and any business phone publisher (i.e., the Yellow Pages) to remove you from its listings of our franchisees in any directory or listings, including any Internet directories. You must immediately cause any Web masters or Internet sites to remove our Marks from their Web pages.

**16.5     Effect of Continued Use of the Marks.**  Upon expiration or termination for any reason whatsoever, any continued use of the Marks by you, the Business or any of your sales associates: (i) will constitute willful and knowing mark infringement, dilution of our trademark rights and unfair competition; and (ii) may constitute trafficking in a counterfeit mark for which both civil remedies and criminal penalties may be imposed.

**16.6     Infringement Damages.**  If we bring an action against you or anyone associated with you in the Business, before or after expiration or termination, seeking to halt infringement of the Marks, you acknowledge that any court having jurisdiction of the matter may enter temporary restraining orders, preliminary and permanent injunctions without posting a bond or other security; and may order the immediate seizure and destruction of any infringing materials. If any court rules that a bond is required and cannot be waived, you stipulate that a $1,000 bond will be sufficient. Furthermore, in addition to your continuing obligations under Sections 16.7, 16.8 and 16.9 below, you will pay Royalty Fees and NAF contributions on all Gross Revenues during the period of any infringement; attorneys' fees incurred by us in the enforcement of our rights concerning the Marks; and the costs and disbursements of bringing the enforcement action. You acknowledge that if you breach this Agreement and/or continue to utilize the System or Marks at such times when you are not legally entitled to use them, we shall have no adequate remedy at law. Therefore, you expressly consent and agree that we may, in addition to any other available remedies, obtain an injunction and/or temporary restraining order to terminate or prevent the continuation of any existing default or violation, and to prevent the occurrence of any threatened default or violation, by you of this Agreement.

**16.7     Surviving Obligations.**

**16.7.1**  Except as specifically set forth in this Agreement, upon expiration of the Agreement or its termination by us, you will have no further interest or rights pursuant to this Agreement. All obligations, incurred before termination or expiration, will not be affected by such expiration or termination; and must be satisfied as would have been required under this Agreement. In addition, you will remain obligated to pay Royalty Fees, NAF contributions, and referral fees, on transactions pending at the time of expiration, termination or assignment. The provisions of this Section 16.7.1 also survive termination or expiration of this Agreement.

**16.7.2**  In the event of an "early termination" of this Agreement (which for purposes of this paragraph shall mean any termination of the Agreement by us "for cause," or any termination of this Agreement by you prior to the Expiration Date for any reason other than pursuant to Section 16.2.1 or 16.2.2.2, you shall immediately become obligated to pay us "lost future profits." For purposes of this Agreement "lost future profits" shall consist of all amounts which you would have been obligated to pay as Royalty Fees, NAF contributions, and any other fees due under this Agreement, from the date of early termination through the Expiration Date, had there been no early termination. The parties acknowledge and agree that it would be impracticable or extremely difficult to calculate the actual amount of lost future profits payable by you, and that the following method of calculation represents a fair and reasonable estimate of foreseeable lost future profits: Lost future profits shall be equal to the combined monthly average of Royalty Fees, NAF contributions, and any other fees under this Agreement (without regard to any fee waivers or fee reductions) payable from the Effective Date of

  

this Agreement through the date of early termination, multiplied by the number of months (or partial months) remaining in the term of this Agreement. The present value of the total of these amounts calculated at a discount rate of 8%, assuming payment is made at the end of each month, shall constitute our lost future profits.

**16.7.3** You acknowledge that during the term of this Agreement and after its termination, (which shall include expiration, where there has been no subsequent assignment or transfer), we shall have the right to access and use (i) all information provided by you to us pursuant to that section of the P&P Manual, Code of Conduct, entitled "Reporting," which specifically includes all items therein included under the categories entitled "Reporting," "Real Estate Transaction Information," and "Listing Information," as well as any other Reporting item or category which may hereinafter be adopted in the P&P Manual; (ii) all information you provided to us contained in those forms or reports known as Commission Disbursement Authorizations ("CDA's") or Sales Reports ("SR's"), and in such other operational reports as we may from time to time request from you; and (iii) all information you provided to us regarding enrollment of your customers or clients in the CENTURY 21 Preferred Client Club (which, for purposes of this Section 16.7.3, shall include such other client/customer contact program(s) as we may adopt). The information referred to in (i), (ii) and (iii), above, shall be referred to, collectively, as "the Client Information." The Client Information may be used by us during the term of this Agreement for business purposes which shall include, but shall not be limited to, public relations, advertising and statistical compilations, investigations and resolutions of customer or client complaints, and quality survey. In addition, we shall have the right, upon termination, to continue to use the Client Information as specified herein, and to make the Client Information available to other CENTURY 21 franchisees for such purposes as we, in our sole and absolute discretion, deem appropriate. In addition, and not in limitation of the above, upon termination, you shall be deemed to have assigned all of your CENTURY 21 Preferred Client Club enrollments to us, to deal with said enrollments in such manner as we deem appropriate. Upon termination, your name and the name of your sales associates will be deleted from Preferred Client Club mailings.

**16.8    Other Damages.** If you take any action after this Agreement is terminated or expires that causes damage to us, and we are successful in obtaining judicial relief against you as a result of such action, you will be liable to us for an additional amount equal to the aggregate of our costs of commencing and prosecuting the action, including, reasonable attorneys' fees, costs of investigation and proof of facts, court costs and other litigation expenses.

**16.9    Post Termination Audit.** You will cooperate with us and permit us to conduct an audit of your records in accordance with Section 13.2 above after this Agreement expires or is terminated.

## 17.0    INDEMNIFICATION AND INSURANCE:

**17.1    Your Indemnification.** You shall indemnify and hold harmless us, and our subsidiaries, affiliates, and our parent, and the directors, officers and employees of each, and all other franchisees from all expenses, fines, suits, proceedings, claims, losses, damages, liabilities or actions of any kind or nature (including, but not limited to, costs and attorneys' fees) arising out of or in any way connected with your operations. You further agree that if we are made a party to a lawsuit or other legal action in connection with the activities of you or any of your Affiliates, then we may tender the defense and/or prosecution of the case to you who shall be responsible for diligently pursuing the case or action at your expense, or we may hire counsel directly to protect our interests and bill you for all costs and attorneys' fees incurred in connection therewith, in which case you shall promptly reimburse us for all costs and expenses which we incurred. This indemnity shall apply to claims that we were negligent or failed to train, supervise or discipline you, and to claims that you or

  

your agents are our agent or part of a common enterprise with us. Your obligations pursuant to this Section shall survive the expiration or termination of this Agreement.

**17.2    Insurance.**

**17.2.1    Required Policies and Coverage.** You will obtain and maintain for the term of the Agreement a commercial general liability insurance policy (including hired and non-owned auto coverage) having combined single limits per occurrence in the amount of at least $1,000,000. You will also obtain and maintain a professional liability (real estate errors and omissions) policy in the amount of at least $1,000,000 per occurrence and any additional types of policies and in such amounts as may be required by applicable law, including, without limitation, workers compensation coverage. We reserve the right to require you to obtain additional types or increased amounts of insurance coverage during the term of this Agreement or to reduce minimum coverage requirements; but you may carry reduced coverage only if and only after you receive our written approval to do so. Such approval may be revoked at any time. If you fail to maintain any required insurance, we may, but are not obligated to, obtain any and all required insurance on your behalf and to charge you for the cost. You will promptly reimburse us for all our costs upon demand.

**17.2.2    Carriers.** All policies must be in form and content satisfactory to us and must be issued by an insurer(s) rated A or better in Class X by Alfred M. Best and Company Inc., or comparably rated by Moody's and/or Standard and Poor's or similarly reliable rating services acceptable to us. We reserve the right to change the minimum acceptable rating requirement.

**17.2.3    Additional Named Insureds.** We and Cendant Corporation, their subsidiaries, successors and assigns must be named additionally as insureds on the commercial general and umbrella insurance policies. We and Cendant Corporation, their subsidiaries, successors and assigns must be named additionally as insureds on the professional liability (errors and omissions) and umbrella insurance policies.

**17.2.4    Notice of Policy Changes or Cancellation.** All policies must provide that they may not be canceled except upon 30 days' advance written notice to us. You must furnish us certificates of such insurance coverage prior to the Effective Date and they must be continually maintained thereafter.

**17.2.5    Annual Certificates.** You must furnish us certificates of coverage annually on or before the anniversary of the Effective Date.

**17.2.6    Tail Coverage.** As one of the conditions to our granting approval of an assignment or request for mutual termination of this Agreement, you must purchase and provide evidence to us that you have purchased tail (extended option) coverage on all such policies for a minimum of 12 months after the effective date of any assignment or mutual termination.

**18.0    AMENDMENT:**

**18.1    Written and Signed.** Any modification, change or amendment to this Agreement must be in writing and signed by the President or any Vice President authorized by our President and by you.

**18.2    Authority to Amend.** NO FIELD REPRESENTATIVE, INCLUDING ANY DIVISIONAL OR REGIONAL PRESIDENT, REGIONAL VICE PRESIDENT OR REGIONAL OR DISTRICT BUSINESS MANAGER OF OURS HAS THE RIGHT OR AUTHORITY TO MAKE ORAL OR WRITTEN MODIFICATIONS, CHANGES OR AMENDMENTS TO THE TERMS OF THIS FRANCHISE

  

AGREEMENT. NO SUCH UNAUTHORIZED MODIFICATION, CHANGE OR AMENDMENT WILL BE BINDING UPON EITHER PARTY.

**19.0.  WAIVER:**

**19.1    Waiver; Severability.**  If any provision(s) of this Agreement is or becomes in violation of any local, state or federal law, then such provision(s) will be considered immediately amended to conform to that law. If the violative provision cannot be amended to conform to that law, each party expressly releases the other from any liability under the violative provision of this Agreement if either party cannot fulfill any obligation under this Agreement due to any provisions of local, state, or federal laws governing the violative provision. No waiver of any breach of any term or condition contained in this Agreement will constitute a waiver of any subsequent breach of the same term or condition.

**19.2    Limitations Period.**  Failure, refusal or neglect by you to exercise any right or remedy arising under this Agreement or otherwise, or with any specification, standard or operating procedure, will waive any default arising under this Agreement or your right to any remedy resulting from such action or inaction, and will prevent exercise or enforcement of any right or remedy, unless you provide written notice of such default to us within 12 months after such right or default occurs.

**19.3    Disputes with Others.**  You and we agree that a decision of an arbitrator, mediator or court of competent jurisdiction in arbitration, mediation or litigation to which one of them is not a party will not in any manner prevent the person that was a party to such action from making similar arguments or taking similar positions in any action between you and us. You and we each waive the right to assert that principles of collateral estoppel prevent either you or us from raising any claim or defense in an action between you and us as a result of such party having lost a similar claim or defense in another action.

**20.0    NON-COMPETITION COVENANTS:**

**20.1    In Term.**  During the term of this Agreement, neither you nor your Owners, officers or your guarantors, or any of the immediate family members of the Owners, officers, guarantors, or Responsible Broker will, directly or indirectly, through ownership or otherwise, engage in any real estate brokerage business or related business without our advance written consent, unless that business is being conducted under a CENTURY 21 franchise agreement.

**20.2    Upon Assignment.**  Any assignee of this Agreement must be protected against the potential for unfair competition by your use of our training, assistance and trade secrets in direct competition with us following an assignment of this Agreement. Therefore, you, your Owners, officers and your guarantors, and any of the respective spouses of the Owners, officers and guarantors, agree that, following assignment of this Agreement, neither you nor your Owners and officers, nor your guarantors, nor any of the respective spouses of the Owners, officers or guarantors, will, for the remainder of the original term of this Agreement, directly or indirectly, operate, own, license, franchise, be employed by or consult with any residential real estate brokerage or related business within a two-mile radius of your Office at your location at the time this Agreement is assigned. This provision will not apply if the Agreement expires according to its terms.

**20.3    Competing Services or Products.**  During the term of this Agreement, neither you nor any of your Owners, officers, employees, sales associates or agents, will organize, manage, operate, hold any ownership interest in or receive compensation from any firm, company or other business entity which provides or seeks to provide equipment, supplies, services or other operating materials to our other franchisees, without our advance written consent.

**21.0    INDEPENDENT CONTRACTOR:**

  

**21.1    Independently Owned and Operated.** You will, at all times, hold yourself and the Business out to be an independently owned and operated business and otherwise operate your Business in compliance with any applicable laws, rules and regulations. You must conspicuously disclose in the Office, in your real estate sale documents, listing agreements and on all Business cards, stationery, and in all advertisements and in all other printed or recorded material you and your sales associates and employees use, that you are independently owned and operated and are not our agent of or owned by us. You expressly understand that you will be an independent contractor and must hold yourself out to the general public as such. This Agreement does not make you an agent, legal representative, joint venture, partner, employee or servant of ours for any purpose. You are not authorized to make or promise any contract, agreement, warranty or representation on our behalf or an affiliate, except as expressly provided in this Agreement, or to create any obligation, express or implied on our behalf. You are not authorized to accept service of process or legal notices directed to us. You acknowledge that this Agreement does not constitute or create, and the relationship between the parties is not, and is not intended to be, a fiduciary relationship.

**21.2    Responsibility for Operations.** We will have no obligation to pay your commissions, taxes, wages or other expenses, and will have no right to regulate or participate in the recruitment, selection, engagement, retention, discipline or termination of your sales associates or employees, or to determine or limit the parties from whom you may accept listings or to or for whom you may sell property, the commission rates you charge, the commission splits between you and your sales associates, your working conditions, the manner or details of work performed by you or your sales associates or employees, except as may be necessary to protect the Marks and goodwill. You agree that you are solely responsible for the conduct of the Business operated under this Agreement according to your own judgment, and in accordance with the provisions of this Agreement and the P&P Manual as they may be amended from time to time.

**22.0    MISCELLANEOUS:**

**22.1    Credit Report.** You authorize us to investigate your credit and will supply us with references and signed consent forms for this purpose. You consent to exchange of information about you, the Business and your business and credit history on a privileged basis between us and your references or persons named in your credit report.

**22.2    Broker Councils.**

**22.2.1  Local Councils.** We may establish a local council of franchisees with boundaries as determined, from time to time, by us. You agree to join and participate in the council established in the area designated by us as your local council area. The local council may make recommendations and suggestions concerning the expenditure of council funds available for promotional purposes in the local area. Such local council may adopt its own by-laws, rules and procedures, but such by-laws, rules and/or procedures shall not restrict your rights or obligations under this Agreement. Except as otherwise provided herein, and subject to our approval, any lawful action of such council at a meeting attended by 2/3 of the members, including reasonable assessments for local promotional and advertising purposes, shall be binding upon you if approved by 2/3 of the member franchisees present, with each member office having one vote, provided that no franchisee (or controlled group of franchisees) shall have more than 25% of the vote in a local council regardless of the number of offices owned..

**22.2.2  Other Councils.** We may establish a regional council of franchisees in each regional area as determined by us. We may establish a national and international council of franchisees with boundaries established by us. Each regional council, national council and international council shall establish its own reasonable bylaws and procedures. Actions of the regional, national and





international councils shall be binding upon you; provided, however, that no council action shall modify the terms and conditions of this Agreement. Regional, national and international councils shall be composed of franchisees that are elected or appointed on a representative basis by members of local or regional councils or us. Representatives to regional, national and international councils shall have voting power in proportion to the number of franchisees in the area or region they represent. We shall not have a vote in any franchisee council.

**22.3    Taxes.** You shall pay promptly when due all taxes, accounts, liabilities and indebtedness of any kind incurred by you in the conduct of the Business. In the event any fees (including, without limitation, royalty fees and the initial franchise fee) payable by you to us are subject to Value Added Taxes, Gross Receipts Taxes, or similar taxes imposed by taxing authorities within the jurisdiction in which you operate, then you shall, in addition to the fees due us, pay to us an additional sum which is equal to and shall represent the amount of such tax imposed on fees due us.

**22.4    Successors and Assigns.** Subject to the provisions of Section 15, this Agreement will be binding upon and inure to the benefit of the parties and their respective legal representatives, successors and assigns.

**22.5    Headings.** The headings in this Agreement are for convenience only, do not constitute a part of this Agreement, and will not be deemed to limit or affect any of the provisions of this Agreement.

**22.6    Time of the Essence.** Time is of the essence of this Agreement.

**22.7    Applicable Law.** This Agreement will be governed by the laws of the state of New Jersey, except that the New Jersey Franchise Practices Act shall not apply to agreements with Offices located outside New Jersey.

**22.8    Venue and Jurisdiction.**

**22.8.1**    You submit to the non-exclusive personal jurisdiction of the State and Federal courts of New Jersey with respect to any litigation pertaining to this Agreement or to any aspect of the business relationship between the parties. Such litigation will have venue in State courts in Morris County, New Jersey, or in the United States District Court for the District of New Jersey.

**22.8.2**    You agree that any judicial proceeding will be considered as to its facts and may not be brought as a class action. You and each of your Owners waive any right to proceed against us by way of class action. The court will not be precluded from making its own independent determination of the issues in question, notwithstanding the similarity of issues in any other judicial or proceeding involving any other franchisee. Each party waives the right to claim that a prior disposition of the same or similar issues preclude such independent determination.

**22.9    WAIVER OF JURY TRIAL. The parties waive the right to a jury trial in any action related to this Agreement or any aspect of the relationship between you, us, any guarantor and their respective successors and assigns.**

**22.10    Waiver of Punitive Damages.** We and you (and your Owners and guarantors) fully waive any right to or claim for any punitive or exemplary damages against the other and agree that if any dispute arises between them, each will be limited to recovery of actual damages sustained which, in the our case, includes lost future profits as set forth in Section 16.7.2.

**22.11    Attorney Fees.** In any claim or counterclaim or other legal proceeding brought by either you or us against the other in connection with this Agreement, the prevailing party shall be awarded reasonable

  

attorneys' fees and costs. The phrase "prevailing party" means the party that recovered the greater relief in the proceeding.

**22.12 Administrative Fees:** We, in our sole discretion, may charge a reasonable administrative fee as set forth in the P&P Manual for processing each of your requests to amend the information set forth in Sections 1.2 through 1.4 and 2.1, 2.2 through 2.5.

**22.13 Variations Among Agreements.** We specifically reserve the right and privilege, at our sole discretion and as it may deem in the interests of those concerned in any specific instance, to vary standards for any other franchisee based upon the peculiarities of a particular area, circumstance, business practice or other condition which we deem of importance to the successful operation of such other franchisee's business. You will not complain on account of any variation from standard specifications and practices granted to any other member and will not be entitled to require us to grant you a like or similar variation under this Agreement. You are not the third party beneficiary of any other franchise agreement.

**22.14 Opportunity to Investigate.** You acknowledge that you have had full opportunity to investigate independently our operations and to be thoroughly advised of the terms and conditions of this Agreement by counsel of your choice. This Agreement is exclusively for the benefit of the parties hereto and may not give rise to liability to any third party unless this Agreement specifically provides for such liability. The exercise by us of any right or discretion provided to us under the provisions of this Agreement shall not constitute the absence of good faith.

**22.15 Integration.** You acknowledge that our operations have been fully explained to you; that you understand its uses, benefits and limitations; and that no representations as to the particular type or amount of benefit to be gained by you have been made by or on our behalf. You have not relied on any written or oral representations except those specifically included in or made a part of this Agreement in writing. This Agreement and any written Addendum signed by our authorized officer and by you represents the entire integrated agreement between us and you and supersedes all prior negotiations, representations or agreements, either written or oral, between the parties and their respective representatives. DO NOT SIGN THIS AGREEMENT IF YOU BELIEVE WE OR ANY OF OUR REPRESENTATIVES HAS PROMISED YOU SOMETHING THAT IS NOT PART OF THIS AGREEMENT, ANY ATTACHED ADDENDUM OR THE OFFERING CIRCULAR.

**22.16 Consent.** In all cases where our prior consent or acceptance is required and no other method or timing for obtaining such consent or acceptance is prescribed, you shall request such consent or acceptance in writing, and we shall notify you of our decision within 30 days after receiving your written request and all supporting documentation. Whenever our consent or acceptance is required hereunder, such consent or acceptance must be in writing. If we do not respond in writing to your request within such 30-day period, the request shall be deemed denied. Our consent to or acceptance of any request by you shall be effective only to the extent specifically stated and we shall not be deemed to waive or render unnecessary consent or acceptance of any subsequent similar request. Except where this Agreement expressly obligates us to reasonably accept or consent to (or not to unreasonably withhold our acceptance of or consent to) any action or request by you, we have the absolute right for any reason to withhold our acceptance of or consent to any action requested by you.

**23.0 ADDITIONAL REPRESENTATIONS:** You make the following additional warranties and representations that are an inducement upon which we are relying to enter into this Agreement:

**23.1** The information provided to us in the franchise application is accurate and complete.

 

**23.2**   If you are an entity that issues capital stock or certificates of interest ownership, you shall be required to place the following legend on all certificates: "THE TRANSFER OF THIS STOCK/INTEREST IS SUBJECT TO THE TERMS AND CONDITIONS OF THAT CERTAIN FRANCHISE AGREEMENT DATED _____ BETWEEN _____ AND CENTURY 21 REAL ESTATE LLC. REFERENCE IS MADE TO SUCH AGREEMENT AND THE RESTRICTIVE PROVISIONS CONTAINED THEREIN." You shall use your best efforts to place said legend on any previously issued stock or certificates.

**23.3**   The address where your records are to be maintained is:

### 2075 De La Cruz Blvd., Santa Clara, CA 95050

**23.4**   You are not obtaining this Franchise for speculative purposes and have no present intention to sell or transfer or attempt to sell or transfer the Franchise in whole or in part.

**23.5**   You understand and acknowledge the importance of the high and uniform standards of quality, appearance and service imposed by us in order to maintain the value of our name and the necessity of operating the Office in compliance with our standards. You represent that you have the present capability and intention to meet those standards.

**23.6.**   You have procured such certificates, licenses and permits, in addition to appropriate real estate licenses, necessary for you to carry on the Business contemplated by this Agreement.

**23.7**   The execution of this Agreement by you will not violate or constitute a breach of the terms of any other agreement or commitment to which you are a party.

**23.8**   The individual executing this Agreement on your behalf is duly authorized to do so; upon its execution, the Agreement shall constitute your valid and binding obligation, and of all of your shareholders, members or partners, if you are a corporation, limited liability company, or partnership.

**23.9**   You acknowledge that no representations, promises, guarantees or warranties of any kind are made or have been made by us or by any person representing himself or herself as our authorized agent or representative to induce you to execute this Agreement, except as specifically set forth in the Franchise Disclosure Documents delivered to you. You acknowledge that the success of the Franchise is dependent upon your efforts; or your partners, if you are a partnership; or your officers, directors and your shareholders, if you are a corporation; or your members, if you are a limited liability company. You and the parties listed in Section 1.3.1 of this Agreement represent that they intend to engage in the management or supervision of the Franchise. You acknowledge that neither we, nor any other person has guaranteed or warranted that you will succeed in the operation of the Franchise, or has provided any sales or income projections of any kind to you.

**23.10**   You, each of your partners (if you are a partnership), each of your officers, directors and shareholders (if you are a corporation), and each of your members (if you are a limited liability company), who will be involved in the management and/or supervision of the Franchise (and whose names are set forth in Section 1.3.1 hereof), have read fully this Agreement, the table of contents of the P&P Manual and the Franchise Disclosure Documents, and fully understand the terms and the import of same, and represent that each is capable of complying and will comply therewith. Further, you acknowledge that you have had not less than 10 business days to review our Uniform Franchise Offering Circular prior to the signing of this Agreement, that we have neither orally nor in writing represented any specified level of sales or profit (i.e., earnings claims), and that any inquiry by you to us has been answered to your satisfaction.

 

**23.11**  You have a net worth in tangible assets in excess of $75,000.00, not including the value of your interest in this Agreement or your principal residence, as of Effective Date of this Agreement, as represented by your financial statement, which has been prepared in accordance with generally accepted accounting principles. This representation shall not be construed in any manner that would in any way restrict or limit your responsibility or degree of obligation and your partners, or your officers, directors and shareholders, as the case may be, as may otherwise be set forth herein, or otherwise be required by law.

**23.12**  U.S. Government Regulations.  As of the effective date of the Agreement, the Owners shall be and, during the entire term of this Agreement shall remain, in full compliance with all applicable laws and regulations of the United States that prohibits unfair, fraudulent or corrupt business practices in the performance of your obligations under this Agreement and related activities.

**23.13**  Goodwill.  You agree not to make or publish any statement or advertisement which would reasonably be expected to demean the image, value, identity, reputation or goodwill associated with our name or trademarks or the Marks described in this Agreement. This covenant is independent of and will survive any termination, expiration or assignment of this Agreement.

**24.0    STATE LAW ADDENDA:**

**24.1    Illinois Addendum:**  If you are a resident of Illinois, the following provisions shall apply and shall supersede any provision in this Agreement to the contrary:

**24.1.1**  The Illinois Franchise Disclosure Act of 1987, as amended (the "Act"), applies to this transaction and supersedes any conflicting provisions of this Agreement or New Jersey law.

**24.1.2**  The first and last sentences of Section 23.9 are deleted from all Franchise Agreements entered into in Illinois.

**24.1.3**  Pursuant to Sections 19 and 20 of the Act, a franchisee must be provided with (i) reasonable notice of default and an opportunity to cure in most instances prior to termination, and (ii) at least six months notice in most instances of non-renewal. Any conflicting provisions of any Franchise Agreement entered into in the State of Illinois will not be given effect.

**24.1.4**  The acknowledgments in Section 22.15 of the Agreement shall not constitute a waiver of liability under the Act.

**24.1.5**  The provisions of Section 22.7 and 22.8 of the Agreement which designate jurisdiction or venue in a forum outside of the State of Illinois, shall not be effective for franchise agreements entered into in Illinois.

**24.1.6**  If any of the provisions of the Agreement are inconsistent with applicable state law, then the state law shall apply to the extent such law is constitutional and valid as applied.

**24.1.7**  All other rights, obligations, and provisions of this Agreement shall remain in full force and effect.

**24.2    Minnesota Addendum:**  If you are a resident of Minnesota, the following provisions shall apply and shall supersede any provision in this Agreement to the contrary:

**24.2.1**  Minnesota law provides franchisees with certain termination and non-renewal rights. Minnesota Statutes, Section 80C.14, Subdivisions 3, 4 and 5 require, except in certain specified cases, that

  

the franchisee be given 90 days notice of termination (with 60 days to cure) and 180 days notice for non-renewal of the franchise agreement.

**24.2.2** No release language set forth in this Agreement shall relieve us or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of Minnesota.

**24.2.3** Section 6 of the Agreement is amended by adding a new Section 6.3 to read as follows:

"The Minnesota Department of Commerce requires that the Franchisor indemnify Minnesota franchisees against liability to third parties resulting from claims by third parties that the franchisee's use of the Franchisor's trademark infringes trademark rights of the third party. Franchisor does not indemnify against the consequences of a franchisee's use of the Franchisor's trademark except if used in accordance with the requirements of the Franchise Agreement, and, as a condition to indemnification, the franchisee must provide notice to Franchisor of any such claim within ten (10) days and tender the defense of the claim to Franchisor. If Franchisor accepts the tender of defense, Franchisor has the right to manage the defense of the claim, including the right to compromise, settle or otherwise resolve the claim, and to determine whether to appeal a final determination of the claim."

**24.2.4** Liquidated damages and termination penalties are prohibited by law in the State of Minnesota and, therefore, Section 16.7 of the Agreement is amended by deleting the current language in Section 16.7.2 and replacing it with the following:

"In the event of an "early termination" of this Agreement (which for purposes of this paragraph shall mean any termination of the Agreement by us "for cause", or any termination of this Agreement made by you prior to the Expiration Date for any reason other than pursuant to Section 16.2.2 or 16.2.4.4), you shall be, continue and remain liable to us for any and all damages which we have sustained or may sustain by reason of such default or defaults and the breach of the Agreement on your part until the end of the Term.

At the time of such Termination, you covenant to pay to us within 10 days after demand compensation for all damages losses, costs and expenses (including reasonable attorney's fees) incurred by us and/or amounts which would otherwise be payable for and during the remainder of the unexpired Term of the Agreement but for such Termination. This does not constitute a waiver of your right to a trial on any of the above matters."

**24.2.5** The following language will be incorporated in any franchise agreement issued in the State of Minnesota:

"Pursuant to Minnesota Statute, Section 80C.21 and Minnesota Rule 2860.4400J, this Agreement shall not in any way abrogate or reduce any of your rights as a franchisee as provided for in the Minnesota Statutes 1987, Chapter 80C, including, but not limited to, the right to submit matters to the jurisdiction of the courts of Minnesota or the right to a jury trial."

**24.2.6** Section 16.6 of the Agreement is amended by adding the following:

"You acknowledge that if you breach this Agreement and/or continue to utilize the Marks or the System at such times when you are not legally entitled to use them, we shall have no adequate remedy at law. Therefore, you expressly consent and agree that we may, in addition to any other available remedies, seek an injunction and/or temporary restraining order to terminate or prevent the continuation of any existing default or violation, and to prevent the occurrence of any

  

threatened default or violation, by you of this Agreement."

**24.2.7** All other rights, obligations, and provisions of the Agreement shall remain in full force and effect. Only the Sections specifically added to or amended by an Addendum shall be affected.

**24.3**    **Rhode Island Addendum:** If you are a resident of Rhode Island, the following provisions shall apply and shall supersede any provision in this Agreement to the contrary:

**24.3.1** Jurisdiction and Venue: A provision in a franchise agreement restricting jurisdiction or venue to a forum outside Rhode Island or requiring the application of the laws of another State is void with respect to a claim otherwise enforceable under the Rhode Island Franchise Investment Act.

**24.3.2** Section 19-28.1-14 of the Rhode Island Franchise Investment Act provides that:

"A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."

This supersedes Section 22.8 or any other contrary provision of the Agreement.

**24.4**    **South Dakota Addendum:** If you are a resident of South Dakota, the following provisions shall apply and shall supersede any provision in this Agreement to the contrary:

**24.4.1** Liquidated damages and the termination penalties are prohibited by law in the State of South Dakota. Therefore, Section 16.7 of the Agreement is amended by deleting the current language in Section 16.7.2 and replacing it with the following:

"In the event of an "early termination" of this Agreement (which for purposes of this Paragraph shall mean any termination of the Agreement by us "for cause", or any termination of this Agreement made by you prior to the Expiration Date for any reason other than pursuant to Section 16.2.2 or 16.2.4.4, you shall be, continue and remain liable to us for any and all damages which we have sustained or may sustain by reason of such default or defaults and the breach of the Agreement on your part until the end of the Term.

At the time of such Termination, you covenant to pay to us within 10 days after demand compensation for all damages, losses, costs and expenses (including reasonable attorney's fees) incurred by us and/or amounts which would otherwise be payable for and during the remainder of the unexpired Term of the Agreement but for such Termination. This does not constitute a waiver of your right to a trial on any of the above matters."

**24.4.2** Franchise registration, employment, covenants not to compete and other matters of local concern will be governed by the laws of the State of South Dakota. As to contractual and all other matters, the Agreement will be and remain subject to the construction, enforcement and interpretation of the laws of the State of New Jersey. Any provision in the Agreement which designates jurisdiction or venue, or requires the franchisee to agree to jurisdiction or venue, in a forum outside of South Dakota, is deleted from any Agreement issued in the State of South Dakota.

**24.4.3** No release language set forth in the Agreement (including, but not limited to Section 18.D thereof) shall relieve us or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of South Dakota.

  

**24.4.4**   Termination provisions covering breach of the Agreement, failure to meet performance standards, and failure to make fee payments contained in the Agreement shall afford you 30 days written notice with an opportunity to cure the default before termination.

**24.4.5**   Any provision that provides that the parties' waive their right to claim punitive, exemplary, incidental, indirect, special or consequential damages OR any provision that provides that parties' waive their right to a jury trial may not be enforceable under South Dakota law.

**24.4.6**   The following provision shall be added to the Agreement:

"Pursuant to SDCL 37-5A-86, any acknowledgment provision, disclaimer or integration clause or a provision having a similar effect in a franchise agreement does not negate or act to remove from judicial review any statement, misrepresentation or action that would violate this chapter or a rule or order under this chapter."

**24.4.7   REGISTRATION OF THIS FRANCHISE DOES NOT CONSTITUTE APPROVAL OR RECOMMENDATION OF THE FRANCHISE BY THE DIRECTOR.**

**24.5**   **Washington Addendum:**  If you are a resident of Washington, the following provisions shall apply and shall supersede any provision in this Agreement to the contrary:

**24.5.1**   The State of Washington has a statute, RCW 19.100.180, which may supersede the Agreement in the franchisee's relationship with the franchisor including the areas of termination and renewal of the franchise.  There may also be court decisions which may supersede the Agreement in the franchisee's relationship with the franchisor including the areas of termination and renewal of the franchise.

**24.5.2**   In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the State of Washington, or in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

**24.5.3**   In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW shall prevail.

**24.5.4**   A release or waiver of rights executed by a franchisee shall not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel.  Provisions such as those that unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act such as a right to jury trial may not be enforceable.

**24.5.4**   Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

**24.6**   **Wisconsin:**  If you are a resident of Wisconsin, the following provisions shall apply and shall supersede any provision in this Agreement to the contrary the following provisions shall supersede and apply to the Agreement:

**24.6.1**   The Wisconsin Fair Dealership Act, Wisconsin Statutes, Chapter 135 (the "Act"), shall apply to and govern the provisions of the Agreement.

 

**24.6.2**  The Act's requirement, including that in certain circumstances a franchisee or member receive 90 days' notice of termination, cancellation, non-renewal or substantial change in competitive circumstances, and 60 days to remedy claimed deficiencies, shall supersede the provisions of Section 16 of the Agreement to the extent they may be inconsistent with the Act's requirements.

(Balance of Page Intentionally Left Blank.)

# Exhibit B

  

## GUARANTY OF PAYMENT AND PERFORMANCE

This Guaranty of Payment and Performance is given by the undersigned, **Sakhawat Jaffery (individually a "Guarantor" and collectively "Guarantors"),** effective as of the Effective Date of the Franchise Agreement to Century 21 Real Estate LLC ("Franchisor"), in order to induce Franchisor to accept **Sakhawat Jaffery, a California sole-proprietor** ("Franchisee") as a franchisee of Franchisor.

Each Guarantor, independently of the obligations of Franchisee, does hereby, jointly and severally, guaranty to Franchisor the prompt payment and performance, when due of all obligations of Franchisee under that certain Franchise Agreement bearing even date hereof, including any renewal, replacement or modification of said agreement (the "Agreement"), and any other franchise agreement or other agreement now existing or hereafter entered into between Franchisee and Franchisor. This Guaranty shall apply to all obligations contained in the Agreement, including the initial franchise fee, all franchise Royalties, Advertising Fees, charges for manuals, supplies, materials, services and products furnished by Franchisor, audit fees, assignment fees, attorneys fees, referral fees, obligations to indemnify and other such charges, fees and assessments provided for under the aforementioned Agreement.

This Guaranty shall be deemed continuing in nature. This Guaranty shall not be discharged by renewal of any claims guaranteed by this instrument, the suffering of any indulgence to any debt and/or the extension of time of payment thereof. Presentment, demand, protest, notice of protest and dishonor, and diligence in collecting any obligation under the Agreement are each and all waived by Guarantors and/or acknowledged as inapplicable. Franchisor shall not be required to pursue any remedy as to said obligations against Franchisee as a condition of the obligation hereunder of Guarantors.

It shall not be a condition to the enforcement of this Guaranty that Guarantors shall be given any notice.

The obligation of each Guarantor hereunder is an absolute and unconditional obligation, and constitutes a guaranty of payment and performance. Separate action or separate actions may be brought and prosecuted against Guarantors whether action is brought against Franchisee or whether Franchisee is joined in any such action or actions. Guarantors waive to the fullest extent permitted by law, the benefit of any statute of limitations affecting their liability under this agreement or the enforcement of this Guaranty, any payment by Franchisee or other circumstance that operates to toll any statute of limitations as to Guarantors. Any Guarantor who is a married person agrees that recourse may be had against his or her separate property for his or her obligations under this agreement.

Each Guarantor hereby expressly waives notice of the acceptance of this Guaranty and agrees that no action or failure to act by Franchisor, including, but not limited to, Franchisor's granting of additional time to pay, shall in any way limit or discharge Guarantor's liability hereunder.

This Guaranty and the liabilities and obligations of Guarantors hereunder are binding upon Guarantors and their respective heirs, executors, successors and assigns, and inure to the benefit of and are enforceable by Franchisor and its successors, transferees, and assigns.

This Guaranty shall be deemed to be made under, and shall be governed by the laws of the State of New Jersey in all respects, including matters of construction, validity, and performance, and its terms and provisions may not be waived, altered, modified, or amended except in writing duly signed by an authorized officer of Franchisor and by Guarantors.

Each Guarantor submits to the non-exclusive personal jurisdiction of the State and Federal courts of New Jersey with respect to any litigation pertaining to the Franchise Agreement or to any aspect of the

 

business relationship between Franchisor and Franchisee. Such litigation will have venue in the State Courts in Morris County, New Jersey, or in the United States District Court for the District of New Jersey.

If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties to this agreement shall be construed and enforced accordingly.

_____
Sakhawat Jaffery, Individually and Personally